# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

*Board of Trustees of the City of Harvey Firefighters' Pension Fund v. City of Harvey*,
2017 IL App (1st) 153074

</div>

| | |
|---|---|
| Appellate Court Caption | BOARD OF TRUSTEES OF THE CITY OF HARVEY FIREFIGHTERS' PENSION FUND, Plaintiff-Appellee and Cross-Appellant, v. THE CITY OF HARVEY, Defendant-Appellant and Cross-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-3074 |
| Filed<br>Rehearing denied | August 4, 2017<br>January 1, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-53364; the Hon. Mary L. Mikva, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part. |
| Counsel on Appeal | Mark D. Roth, of Roth Fioretti, LLC, of Chicago, for appellant.<br><br>Jeffrey A. Goodloe, of Puchalski Goodloe Marzullo, LLP, of Northbrook, for appellee. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Lampkin specially concurred, with opinion.

**OPINION**

¶ 1      Defendant City of Harvey (Harvey) is a municipality with a population of approximately 25,000 residents, located south of the City of Chicago. Plaintiff, the Board of Trustees of the City of Harvey Firefighters' Pension Fund (Pension Board), is an administrative body created pursuant to section 4-121 of the Illinois Pension Code (Code) (40 ILCS 5/4-121 (West 2014)) to oversee and manage the City of Harvey Firefighters' Pension Fund (Pension Fund). 40 ILCS 5/4-120 to 4-129 (West 2014). The Pension Board filed suit, alleging that Harvey has underfunded the Pension Fund and breached a 1996 settlement agreement in which Harvey agreed to make certain contributions to the Pension Fund. The Pension Board sought a declaratory judgment, a writ of *mandamus*, injunctive relief, and an order compelling enforcement of the 1966 settlement agreement. After both parties filed motions for summary judgment, the trial court granted the Pension Board's motion for a declaratory judgment, injunctive relief, and enforcement of the 1996 settlement agreement and denied summary judgment for a writ of *mandamus*. The trial court found that Harvey violated the pension statute but was not on the verge of default or imminent bankruptcy. The trial court denied Harvey's motion for summary judgment. Pursuant to this ruling, the trial court assessed damages against Harvey for $15,071,089.15. The injunction that was issued required Harvey to approve a line-item property tax levy specifically for the Pension Fund, which would be sufficient to meet the annual actuarial requirements set forth in the Code. Harvey filed a notice of appeal, and the Pension Board filed a notice of cross-appeal.

¶ 2      The parties argue on appeal about (1) whether the trial court correctly determined that Harvey breached the 1996 settlement agreement, (2) whether the trial court correctly calculated the damages, (3) whether the trial court correctly rejected Harvey's affirmative defenses of separation of powers and *laches*, (4) whether the trial court erred in making a finding of violations of the Code and requiring certain monies to be paid into the Pension Fund without first finding that Harvey was on the verge of default or imminent bankruptcy, and (5) whether the trial court erred in finding that Harvey is *not* on the verge of default or imminent bankruptcy.

¶ 3                        BACKGROUND
¶ 4           I. The 1993 Complaint and 1996 Settlement Agreement
¶ 5      On February 17, 1993, the Pension Board filed a complaint for *mandamus*, declaratory judgment, and accounting, alleging that Harvey had failed to adequately fund the Pension Fund between 1988 and 1994 and claiming that not all of the taxes levied and collected were deposited into the Pension Fund as required by the Code. Ill. Rev. Stat. 1991, ch. 108½, ¶¶ 4-120 to 4-129.

¶ 6      On August 22, 1996, the parties entered into a settlement agreement that required Harvey to "repay the amount due and owing to the [Pension Fund] *** which is approximately

$912,652.00 over a five (5) year period including [Harvey's] annual tax levy an amount in addition to the amount of levy requirements minus the allocation of personal property replacement taxes, recommended by the Illinois Department of Insurance."

¶ 7    Further, Harvey agreed that, "in the future," it would "ensure property taxes levied or personal property replacement taxes received on behalf of the [Pension Fund], which are assessed, collected and remitted to the City of Harvey by the Cook County Treasurer's Office, shall be paid to the [Pension Fund] within 30 days of receipt by [Harvey] and not used by [Harvey] for other corporate purposes." In addition, the parties agreed that the trial court retained jurisdiction over the matter to enforce the settlement agreement, providing: "The Court hereby expressly retains jurisdiction of this matter for the purposes of enforcing all of the terms and provisions of this Agreed Settlement Order."

¶ 8                                        II. 2010 Complaint

¶ 9    On December 17, 2010, 15 years after the execution of the settlement agreement, the Pension Board filed a complaint stemming from Harvey's alleged violations of section 4-118 of the Code (40 ILCS 5/4-118 (West 2008)), commencing in the fiscal year 2005 and continuing through fiscal year 2010. All of the evidence in this case concerned facts that ended with the fiscal year 2014.

¶ 10    The Pension Board filed an amended complaint on September 29, 2011, which added individual defendants Eric Kellogg, the mayor of Harvey; Maggie Britton, the Harvey comptroller in 2010; and Charles Givines, Joseph Whittington, Daryle Crudup, Michael Bowens, Donald Nesbit, and Keith Price, members of Harvey's city council.

¶ 11    On November 18, 2011, Harvey moved to strike the individual defendants from the Pension Board's first amended complaint. Following the filing of this motion, the Pension Board filed a second amended complaint on June 25, 2012, which asserted a count for breach of fiduciary duty against the individual defendants. On July 25, 2012, Harvey filed a combined section 2-615 and 2-619 motion to dismiss the second amended complaint with prejudice or, alternatively, a section 2-615 motion to strike the individual defendants from the second amended complaint. 735 ILCS 5/2-615(a), 2-619(a)(9) (West 2010).

¶ 12    On October 24, 2012, while Harvey's motions were pending, the Pension Board filed an emergency motion to compel Harvey to levy a tax in order to fund "an amount at least equal to the amount determined by an actuary for 2011 in the amount of $1,558,762.00." On October 26, 2012, Harvey filed a motion to strike the Pension Board's emergency motion, arguing that the emergency motion sought the same remedy that the Pension Board seeks in its second amended complaint. On October 29, 2012, the trial court denied the Pension Board's emergency motion.

¶ 13    On November 5, 2012, the Pension Board filed its third amended complaint, adding claims for *mandamus* and injunctive relief.

¶ 14                          III. Plaintiff's Fourth Amended Complaint

¶ 15    On December 14, 2012, the Pension Board filed its fourth amended complaint, which is the subject complaint in this appeal. Its four counts seek (1) a declaratory judgment that Harvey must annually levy a tax to contribute to the Pension Fund and pay money damages, (2) a writ of *mandamus* compelling Harvey to levy an annual tax for the Pension Fund or otherwise

annually contribute to the Pension Fund an amount that fulfills the annual actuarial requirement, (3) injunctive relief ordering Harvey to levy an annual tax for the Pension Fund or otherwise annually contribute to the Pension Fund an amount that meets the annual actuarial requirement and to pay money damages, and (4) an order that finds that Harvey breached the 1996 settlement agreement and an order compelling enforcement of that agreement.

¶ 16    On January 15, 2013, Harvey filed a combined section 2-615 and 2-619 motion to dismiss the Pension Board's fourth amended complaint. 735 ILCS 5/2-615(a), 2-619(a)(9), 2-619.1 (West 2010). Harvey's motion addressed each count of the Pension Boards' fourth amended complaint as follows.

¶ 17    First, Harvey argues that an action for declaratory judgment is inappropriate because declaratory judgment is a vehicle used to address a "controversy one step sooner than normal after a dispute has arisen, but before steps are taken which would give rise to a claim for damages or other relief." Harvey also argues that declaratory judgment would be inadequate because it cannot alter actions that the parties have already taken. Second, Harvey argues that a writ of *mandamus* cannot force a legislative body to perform a discretionary act; therefore, a writ is unable to "compel [Harvey] to make municipal pension fund contributions that meet the annual actuarial requirement." Third, Harvey argues that the Pension Fund had not sustained any damages that could not be adequately remedied with money damages; therefore, injunctive relief is an inapplicable remedy. Finally, Harvey argues that the trial court has no jurisdiction to enforce the 1996 settlement agreement because the agreement explicitly agreed that the original court in the 1993 action retained jurisdiction to enforce the agreement. That original court in 1993 was Calendar 12 of the Chancery Division in the circuit court of Cook County.[1]

¶ 18    In addition to its section 2-615 arguments, Harvey also moved to dismiss pursuant to section 2-619(a)(9), claiming that the suit was barred by governmental immunity. 735 ILCS 5/2-615(a), 2-619(a)(9) (West 2010). Harvey argues that the Pension Board's claims must fail because "(a) [Harvey] is not liable for its council members' negligence in performing governmental functions; and (b) [Harvey] is not liable under the Local Governmental and Governmental Employees Tort Immunity Act [(Tort Immunity Act) (745 ILCS 10/8-101(a) (West 2010))]."

¶ 19    The trial court heard argument on May 24, 2013, and denied Harvey's motion to dismiss count I, for declaratory judgment; count II, for a writ of *mandamus*; and count III, for injunctive relief. However, the trial court granted Harvey's motion to dismiss count IV, for breach of the 1996 settlement agreement, due to lack of jurisdiction, and cited in support the provision of the settlement agreement allowing only the original trial court to maintain jurisdiction over enforcement of the agreement. However, after granting the motion to dismiss count IV, the trial court allowed the Pension Board leave to re-plead before the original trial court that had approved the 1996 settlement agreement and that matter was transferred to the original trial court.

---

[1]The trial court in this matter was Calendar 6 of the Chancery Division in the circuit court of Cook County.

#### IV. Motions to Compel Enforcement and Consolidate

On December 11, 2013, the trial court consolidated this case with the earlier case and transferred the motion to compel enforcement of the 1996 settlement agreement to Calendar 12.

Following consolidation, both parties filed motions for summary judgment on October 14, 2014, with the Calendar 6 court, which are the subject of this appeal. 735 ILCS 5/2-1005 (West 2012).

#### V. Pension Board's Motion for Summary Judgment

The motions for summary judgment are described in depth with year-by-year financial detail, which is necessary to understand the magnitude of the funding problem. In the Pension Board's motion for summary judgment, the Pension Board argues that Harvey must be required to adequately contribute to the Pension Fund because the Pension Fund is on the verge of default or imminent bankruptcy and will become insolvent without judicial intervention.

#### A. Overview

To support its claims, the Pension Board attached to its motion for summary judgment 16 exhibits, including the complete transcripts of the discovery depositions of the following individuals: (1) Gloria Morningstar, the Harvey City Treasurer; (2) Maggie Britton, a CPA for Alli Financial and a Harvey city assistant comptroller; (3) Joseph Letke, a CPA and the Harvey city comptroller; (4) Sandor Goldstein, an actuary; (5) Calene Zabinski, the Pension Fund's auditor; (6) Jamie Wilkey, a CPA with Lauterbach & Amen; (7) James Ritchie, the Pension Fund's CPA; (8) Todd Schroeder; the Pension Fund's actuary; (9) Jon Willhite, the Pension Fund's financial consultant; (10) Daniel Mumpher, the Director of the Local Government Division for the state comptroller; and (11) Scott Brandt, an Illinois Department of Insurance representative.

In addition, the Pension Board attached, as exhibits, the Illinois Department of Insurance notice of noncompliance issued to Harvey, dated February 20, 2013, and the Securities and Exchange Commission complaint filed against Harvey and Joseph Letke on June 24, 2014.

#### B. Mismanagement Claim

In its motion for summary judgment, the Pension Board argues that the Pension Fund contributions are being mismanaged and underfunded by Harvey and that the Pension Fund is being underfunded. In support of this assertion, the Pension Board presented financial information regarding the Pension Fund from fiscal year 2005 through fiscal year 2014. First, the Pension Board presented the annual actuarial requirement as calculated by three different actuaries. Section 4-118 of the Code explains what an annual actuarial requirement is:

> "[T]he annual actuarial requirements of the pension fund are equal to (1) the normal cost of the pension fund, or 17.5% of the salaries and wages to be paid to firefighters for the year involved, whichever is greater, plus (2) an annual amount sufficient to bring the total assets of the pension fund up to 90% of the total actuarial liabilities of the pension fund by the end of municipal fiscal year 2040, as annually updated and determined by an enrolled actuary ***." 40 ILCS 5/4-118(a) (West 2012).

¶ 30    In its motion, the Pension Board presented the calculations of three separate actuaries concerning the annual actuarial requirements: Tim Sharpe;[2] Todd Schroeder; and Scott Brandt, who represents the Illinois Department of Insurance. Second, the Pension Board attached the deposition transcript of Maggie Britton, who is the Harvey comptroller, and who testified about the monies that Harvey appropriated for the Pension Fund and how the appropriation ordinance was determined. Further, the Pension Board attached Britton's deposition exhibits, which set forth the amount appropriated by way of the ordinance and the amount sought through a tax levy. Lastly, the Pension Board attached the depositions of Jamie Wilkey, a CPA, and Calene Zabinski, the Pension Fund auditor. Through these depositions and exhibits, the Pension Board established the amount that Harvey actually contributed to the Pension Fund for each fiscal year.

¶ 31    The Pension Board presented various exhibits to provide the financial information for fiscal years 2005 through 2014:

| Year | Annual Actuarial Requirement | Levied for Pension Fund | Paid to Pension Fund |
|------|------------------------------|--------------------------|-----------------------|
| 2005 | $876,692 (Brandt) $880,632 (Sharpe) | $0 | $9,885 |
| 2006 | $980,024 (Brandt) $945,580 (Sharpe) | $0 | $38,304 |
| 2007 | $1,060,727 (Brandt) $1,061,219 (Sharpe) | $480,632 | $615,407 |
| 2008 | $1,140,932 (Brandt) $1,077,837 (Sharpe) | $1,061,219 | $771,471 |
| 2009 | $1,294,791 (Brandt) | $1,061,219 | $18,181 |
| 2010 | $1,574,792 (Brandt) | $350,000 | $5,143 |
| 2011 | $1,611,369 (Brandt) $1,558,762 (Sharpe) | $0 | $0 |
| 2012 | $1,611,369 $1,558,762 | $0 | $0 |
| 2013 | $1,531,760 (Schroeder) | $0 | $0 |
| 2014 | $2,070,500 (Schroeder) | $600,000 | $600,000 |

¶ 32    In the motion for summary judgment, the Pension Board cited information provided in the deposition of Sandor Goldstein, an actuary, who was retained by Harvey to calculate how much money Harvey owed the Pension Fund. Goldstein testified that he calculated the contribution deficiency using the difference between the annual actuarial valuations and the actual amount Harvey contributed to the Pension Fund between fiscal year 2005 and fiscal year 2013. Goldstein opined that the total contribution deficiency up to the end of 2013 was

---

[2]Tim Sharpe was not deposed; however, the information regarding his actuarial evaluations was introduced through the deposition of Jon Willhite.

$8,077,602. Additionally, he calculated that the accumulated contribution deficiency, which is the loss of revenue to the Pension Fund because Harvey did not properly contribute to the Pension Fund, to be $10,009,403. Basically, Goldstein calculated that Harvey "deprived the Pension Fund of $8 million in *actual* contributions and another $2 million in *actual* investment gains on those contributions." Lastly, the Pension Board cited the deposition of Todd Schroeder, who calculated that the Pension Fund should have approximately $34 million in assets as of 2014 rather than the $11,180,962 in assets that the Pension Fund actually had. As a result, the Pension Fund was deficient at the end of 2013 by approximately $23 million.

¶ 33                    C. On the Verge of Default or Imminent Bankruptcy

¶ 34    In its motion for summary judgment, the Pension Board argues that the Pension Fund is on the verge of default or imminent bankruptcy. The following deposition testimonies provided the evidence to determine whether the Pension Fund is on the verge of default or imminent bankruptcy.

¶ 35                                1. Gloria Morningstar

¶ 36    The deposition of Gloria Morningstar, Harvey's treasurer, was attached to the motion for summary judgment. Morningstar testified that, as treasurer for Harvey, she oversees its fiscal monies, revenue, and disbursements and is responsible for preparing the annual financial report submitted to the Illinois Comptroller's Office, as required by statute. She testified that she had not completed the annual financial reports since the fiscal year of 2008 because she never received the 2008 audit, which Harvey is yet to complete and which is necessary to complete the report.

¶ 37    Morningstar testified that Harvey budgeted $458,400 in 2005 for retirement and pension funds, but Harvey contributed only $9885, while the employees contributed $204,149 to the Pension Fund. However, the Pension Fund paid out $1,398,003 in benefits for that year.

¶ 38    Morningstar testified that Harvey's total revenue for fiscal year 2006 was $20,446,917, and that it contributed $38,304 to the Pension Fund, while the employees contributed $245,146, and the Pension Fund paid $1,439,262 out in benefits.

¶ 39    For fiscal year 2007, Morningstar testified that Harvey collected $19,328,100 in revenue and contributed $565,407 to the Pension Fund, while employees contributed $245,555. However, the Pension Fund paid out $1,582,325 in benefits. Morningstar explained that Harvey's tax levy ordinance for fiscal year 2007 showed that Harvey had budgeted $1,180,632 for the Pension Fund, but Morningstar was unable to explain why the amount budgeted for the Pension Fund at the beginning of the year was greater than the amount budgeted in the fiscal year end audit.

¶ 40    For fiscal year 2008, Morningstar testified that Harvey collected $19,585,131 in total revenue and that the audit report showed that the annual required contribution to the Pension Fund was $1,077,837. However, the actual contribution made by Harvey was only $468,365.

¶ 41    Morningstar testified that Harvey does have a statutory requirement to contribute to the Pension Fund and that Harvey has not contributed as required by statute since 2005. At the time of her deposition on February 28, 2014, Morningstar testified that Harvey had not made any contributions to the Pension Fund since 2009.

## 2. Maggie Britton

Maggie Britton, a certified public accountant for Alli Financial and one of two comptrollers for Harvey, provided deposition testimony that, as comptroller, her duties include financial management, preparation of the annual budget, internal audits, and tracking expenditures and revenue. Britton testified that she performs the day-to-day comptroller duties, while Joseph Letke is the official comptroller for Harvey, which means that she assists in the preparation of the annual financial reports which are submitted to the Illinois Comptroller's Office. Britton testified that Harvey has not been completing the required audits, so they are unable to complete the annual financial reports. Britton testified that Harvey had not undergone an audit for fiscal years 2010, 2011, 2012, or 2013.

Britton next testified regarding personal property replacement taxes, which are taxes disbursed by the State of Illinois to the municipalities eight times per year. Britton testified that a portion of the personal property replacement taxes is statutorily required to be contributed to the Pension Fund. Britton testified that Harvey received $805,674 in personal property replacement taxes for 2007; $888,081 for 2008; $778,539 for 2009; $649,436.17 2010; and $797,445.69 for 2011. However, Harvey had not contributed *any* personal property replacement taxes to the Pension Fund during these years. Additionally, Britton testified that Harvey did not levy any money for either the fire or police pension funds for 2005 through 2010.

Britton testified that Harvey appropriated $300,000 in 2005; $300,000 in 2006; $1,180,632 in 2007; $197,000 in 2008; $1,161,219 in 2009; $1,161,219 in 2010; $0 in 2011; $480,000 in 2011; $450,000 in 2013; and $1,781,542 in 2014 for the Pension Fund.

Britton testified that she knows there is a statute that requires contributions to be transmitted to the Pension Fund every year and that Harvey should fund the Pension Fund based on the most recent actuarial calculations that provide the required amount of funding. Specifically, Britton testified that, "based on the rate of return for investments and employee contributions, the [Pension Fund] could be facing a shortfall in [fewer than 10 years]."

## 3. Joseph Letke

During his deposition, Joseph Letke, the official comptroller for Harvey starting in 2003, invoked his fifth amendment privilege against self-incrimination 178 times and refused to answer questions regarding (1) fraudulent and misleading bond offerings, (2) a developer who collected bond proceedings from Harvey then fled to India, (3) the accusation that Letke collected fees from both Harvey and the developer, who fled to India, (4) why each Harvey alderman had an $80,000 unmonitored expense account, (5) why Harvey paid an alderman's son $325 an hour for snow removal, and (6) why Harvey paid the mayor's son $88,000 to develop a social media website.

Additionally, the Pension Board attached to its motion for summary judgment a complaint filed by the Securities and Exchange Commission (SEC) against both Harvey and Letke. The complaint alleges:

> "[a] scheme by [Harvey] and Joseph T. Letke to misuse proceeds raised from investors in municipal bonds issued by Harvey. From 2008 to present, Harvey and its Comptroller, Letke, have engaged in a scheme to divert bond proceeds for improper purposes, including undisclosed payments to Letke."

Further, the complaint alleges that Harvey and Letke offered fraudulent bond offerings for $6 million in 2008, $3 million in 2009, and $3 million in 2010.

The complaint alleges that these bond offerings were to provide funding for a "Holiday Inn Hotel in Harvey" and:

> "Thus, it was important to bond investors that money raised from the bond offerings, consistent with the stated purpose, was actually used to fund the hotel development, since the amount of funds to repay the bonds derived from tax revenues would be materially affected by the funding and progress of the Hotel Redevelopment Project."

However, unknown to the bond investors and contrary to the representations made by Harvey and Letke, "Harvey officials improperly diverted at least $1.7 million of bond proceeds from these offerings into the general operation accounts of Harvey to pay [Harvey's] operation costs, including payroll. Letke *** also received approximately $269,000 in undisclosed payments derived from bond proceeds[.]"

Due to these alleged misappropriations and misrepresentations, the SEC sought (1) money damages against Letke, (2) a temporary restraining order prohibiting Harvey from offering or selling its own municipal securities, (3) a permanent injunction prohibiting Harvey from selling municipal securities for five years unless an independent consultant reviews and approves of its municipal security disclose policies and procedures, and (4) a permanent injunction prohibiting Letke from participating in any capacity in a municipal securities offering.

### 4. Jon Willhite

Jon Willhite, the Pension Fund's financial consultant since the 1980s, testified in his deposition regarding a calculation table showing his calculations for lost revenue between fiscal years 2005 and 2013. This table is a calculation for lost revenue based on the recommended tax levy as opposed to the collected tax levy. The table appears as follows:

| Fiscal Year | Required Contribution | Contribution Received | Investment Return | Shortfall | Lost Revenue | Cumulative |
|---|---|---|---|---|---|---|
| 2005 | $880,632 | $9,885 | 4.18% | $870,747 | $888,963.37 | $888,963 |
| 2006 | $945,580 | $38,304 | 7.80% | $907,276 | $942,661.93 | $1,900,969 |
| 2007 | $1,061,219 | $615,407 | 10.17% | $445,812 | $468,476.94 | $2,562,735 |
| 2008 | $1,140,932 | $771,471 | 3.06% | $369,461 | $375,115.17 | $3,016,289 |
| 2009 | $1,294,791 | $18,181 | -12.06% | $1,276,610 | $1,199,637.40 | $3,852,195 |
| 2010 | $1,574,792 | $5,134 | 18.15% | $1,569,658 | $1,712,113.49 | $6,263,527 |
| 2011 | $1,611,369 | $0 | 9.65% | $1,611,369 | $1,689,086.91 | $8,556,806 |
| 2012 | $1,611,369 | $0 | -2.05% | $1,611,369 | $1,594,812.58 | $9,975,780 |
| 2013 | $1,531,760 | $0 | 7.07% | $1,531,760 | $1,585,940.72 | $12,267,438 |

Willhite testified that he created this document to show the data that he examined in calculating the cumulative loss in revenue to the Pension Fund. Based on his calculations, Harvey's lack of contributions to the Pension Fund has resulted in a cumulative lost revenue of

$12,267,438 from 2005 to 2013. Willhite testified that the cumulative total is the total lost revenue plus the investment returns.

¶ 55 Willhite was asked, based on his experience as the Pension Fund's financial consultant, whether the Pension Fund is on the verge of default or imminent bankruptcy. Willhite responded by testifying:

"we took on the plan in 2009 *** and the assets were at 17 million and some change. We've had a positive annual rate of return in the 7s, I believe, over that time frame compounding. I would have to go back and get the actual number, but it's been a fairly decent return. And [the Pension Fund has] gone from over 17 million to approximately $11.1 million as of the close two days ago.

So that would tell me that if you were to take the monthly—or the monthly outflows of over 300,000 a month going out and continue to expand upon that and just take that annual number of $1.2 million and divide that by the 11 million, yeah there's going to be a time when there's no money left in that plan; and it's shorter than the life expectancy of the retirees."

¶ 56 Willhite further opined: "[a]t their current condition and the rate of money that's going out they will reach a time when there will be no money left in the [Pension Fund] as we know it today." Willhite further opined that if the tax levy is not reinstated, then the Pension Fund is going to be in "dire, dire problems." Willhite continued his opinion by stating that the Pension Fund is being forced to sell assets to pay the beneficiaries. Willhite testified that, of all the pension funds he works with, Harvey's Pension Fund is the worst funded.

¶ 57 Willhite opined that the Pension Fund would be insolvent in seven to nine years. He based this opinion on the fact that, in 2009, the Pension Fund had over $17 million in assets; however, it lost over $7 million in assets since that year without adequate contributions from Harvey. Even more concerning to Willhite is that the Pension Fund has had a 9.75% return over that same time frame, which, normally, would indicate a positive increase in monies in the fund. However, that was not the case in Harvey because of inadequate contributions by Harvey.

¶ 58                                              5. Sandor Goldstein

¶ 59 Sandor Goldstein is an actuary who was hired by Harvey to review the calculations by Jon Willhite, the actuary for the Pension Fund. Goldstein testified as follows at his deposition.

¶ 60 In reviewing the pertinent documentation, Goldstein opined that Willhite's calculations were deficient as to the total loss revenue for the Pension Fund due to the lack of contributions from Harvey. Goldstein testified:

"Well, it was deficient because he basically just went to each year's actuarial valuation and considered the annual requirement for that year versus the employer contribution for that year and added it all up over the full period from 2005 to 2013, and that doesn't take into account that if there's—if [Harvey] had actually made those contributions in the early years, then those contributions would have had some investment earnings and would have added to the assets, and therefore the contributions in the later years would have been less, so in a way, when we look at the deficiency in contributions in one year, we've already taken it into account, but if we—and that affects the required contribution in the future year, and if you don't make that contribution, the required

contribution in the future year will be less also; so you're counting the effect of these deficiencies in contributions twice, first in the year when it's not made and then also in the later years where you're contributing more, so I feel that once you've recorded a deficiency in contributions you need to add it into the assets to calculate future year deficiencies."

¶ 61    Goldstein testified that, in his calculations for accumulated contribution deficiency, he would assume that Harvey had actually contributed the annual actuarial requirement and that the Pension Fund had the money invested at a particular rate of return for each fiscal year. Based on this method of calculation, Goldstein provided the following chart, which lays out all of his calculations:

| Year | Annual Actuarial Requirement | Levied for Pension Fund | Paid to Pension Fund |
|---|---|---|---|
| 2005 | $876,692 (Brandt) $880,632 (Sharpe) | $0 | $9,885 |
| 2006 | $980,024 (Brandt) $945,580 (Sharpe) | $0 | $38,304 |
| 2007 | $1,060,727 (Brandt) $1,061,219 (Sharpe) | $480,632 | $615,407 |
| 2008 | $1,140,932 (Brandt) $1,077,837 (Sharpe) | $1,061,219 | $771,471 |
| 2009 | $1,294,791 (Brandt) | $1,061,219 | $18,181 |
| 2010 | $1,574,792 (Brandt) | $350,000 | $5,143 |
| 2011 | $1,611,369 (Brandt) $1,558,762 (Sharpe) | $0 | $0 |
| 2012 | $1,611,369 $1,558,762 | $0 | $0 |
| 2013 | $1,531,760 (Schroeder) | $0 | $0 |
| 2014 | $2,070,500 (Schroeder) | $600,000 | $600,000 |

¶ 62    Based on his accumulated contribution deficiency calculations, Goldstein opined that if Harvey had been contributing pursuant to the requirements of the Code, that the Pension Fund would have an additional $10,009,403 in assets, for a total of approximately $22 million on May 1, 2012.

¶ 63                              6. Calene Zabinski

¶ 64    Calene Zabinski, a CPA who works as a finance director and treasurer for various towns and municipalities across the state, was hired to perform the year-end audit of the Pension Fund for 2008 through 2013. As a result of conducting these audits, Zabinski testified regarding the assets, annual actuarial requirement calculations, and the percentage of the annual actuarial requirement Harvey had contributed. Additionally, Zabinski used that information to establish the Pension Fund's net change in assets and the percent it was funded.

| Year | Annual Actuarial Requirement (AAR) | Harvey Contribution | % of AAR Harvey contributed | Net Change in Assets (+/-) | % Funded |
|---|---|---|---|---|---|
| 2008 | $1,077,837 | $771,471 | 71.58% | -$185,866 | 59.16% |
| 2009 | $1,294,791 | $18,181 | 1.4% | -$3,619,875 | 50.79% |
| 2010 | $1,574,792 | $5,143 | 0.33% | +$955,176 | 38.28% |
| 2011 | $1,611,369 | $0 | 0.0% | -$156,474 | 40.46% |
| 2012 | N/A | $0 | 0.0% | -$1,860,149 | N/A |
| 2013 | $2,036,497 | $0 | 0.0% | -$704,363 | 34.68% |

¶ 65    Zabinski testified that, although it is rare for a municipality to have a fully funded pension fund, she is concerned regarding the continued underfunding of the Pension Fund in Harvey. She testified that "the continued underfunding, coupled with that increase in the rate of pay higher than the actuarial assumption, eventually will get to the point where [Harvey] is going to have to pay for the pensioners." In other words, the underfunding will cause the dissipation of the Pension Fund's assets which will result in the fund having no assets, thereby requiring Harvey itself to pay the pension benefits.

¶ 66                                    7. Jamie Wilkey

¶ 67    Jamie Wilkey, an accountant with Lauterbach & Amen, an accounting firm that specializes in the accounting of government entities, testified that her firm was hired to perform an audit of the Pension Fund for fiscal years 2005, 2006, and 2007. She testified that there were 113 plan members in the Harvey firefighter's pension fund as of 2004, with 49 active plan members and 64 retirees and beneficiaries.

¶ 68    Wilkey testified that the Pension Fund had $16,699,170 in assets as of April 30, 2005, that Harvey contributed $9885 to the Pension Fund for that same year, and that the Pension Fund paid out $1,398,003 in benefits for that year. Harvey was required to contribute 12.2% of the Personal Property Replacement Tax (PPRT), but did not do so.

¶ 69    Based on the 2005 annual audit report, Wilkey testified that the Pension Fund, as of fiscal year 2005, was 63.87% funded. She testified that the category entitled "annual pension cost" is the number "that reflects the annual required contribution adjusted for the interest on the outstanding net pension obligation as well as adjusted for the actuary's calculation of retiring the unfunded portion of the liability as well." For fiscal year 2005, Wilkey testified that the annual pension costs were $823,021 and that Harvey's contribution of $9885 to the Pension Fund accounted for only 1.20% of the annual pension cost for 2005. There were 47 active plan members and 71 retirees and beneficiaries drawing off the Harvey firefighter's pension fund as of April 30, 2005.

¶ 70    Wilkey testified that the Pension Fund had $16,782,216 in assets as of April 30, 2006, and paid out $1,585,940 in benefits and refunds, while Harvey contributed only $38,304. Using these numbers, Wilkey opined that the Pension Fund was 59.31% funded. Although Harvey contributed $38,304 to the Pension Fund, the contribution accounted for only 3.91% of the

annual required contribution. As of April 30, 2006, there were 50 active plan members and 66 retirees and beneficiaries; the percent funded of the firefighters' pension fund was 57.82% for the 2006 year.

¶ 71    Wilkey testified that the Pension Fund had $17,715,906 in assets as of April 30, 2007. For this same year, Harvey contributed $615,407 to the Pension Fund, and the Pension Fund paid out $1,582,325 in benefits and refunds. Additionally, the Pension Fund was 57.8% funded, and Harvey contributed 58.02% of the annual pension costs. Further, after examining the annual financial report for fiscal year 2009, she testified that the net pension obligation for Harvey was $4,539,179, and Harvey contributed only $18,181.

¶ 72    Wilkey testified that personal property replacement taxes are revenue transmitted to cities within Illinois, which then contribute 12.2% of these taxes to the cities' pension funds. Wilkey opined that Harvey would owe the Pension Fund $125,773.33 in personal property replacement taxes as of the time of her deposition on February 28, 2014.

¶ 73                                           8. James Ritchie

¶ 74    James Ritchie, a CPA and client manager for Lauterbach & Amen, who worked directly with the Pension Fund, testified to the Pension Fund's financial condition and was concerned for its financial viability. He testified:

> "With statutorily required increases in benefits being paid out as well as the expenses and then the lack of municipal funding that is coming in, it looks that the assets are slowly being depleted to pay out benefits as required by statute. Without municipal funding I would say, in an estimation, the [Pension Fund] will begin to have difficulty paying out benefits by the end of this decade."

¶ 75    Richie testified that the lack of cash assets or investments that are available for the payment of benefits, combined with the increases in the cost of living, is going to create problems in paying out benefits. Ritchie testified that, in his opinion, the Pension Fund is on the verge of going insolvent and "has approximately five years before that's a very real possibility, of being completely insolvent."

¶ 76    Based on his review of the fund's statement of net position ending December 31, 2013, Ritchie testified that Harvey has collected $469,637.06 on behalf of the Pension Fund, but has not remitted any of it into the Pension Fund. Ritchie reviewed financial statements from April 30, 2007, through April 30, 2013, and calculated the total amount of money that Harvey had failed to contribute to the Pension Fund between fiscal years 2005 and 2013 as approximately $10.19 million. However, Ritchie did not account for the loss of investment opportunity in his calculations.

¶ 77                                          9. Todd Schroeder

¶ 78    Todd Schroeder, an actuary with Lauterbach & Amen, was hired to conduct the actuarial valuation for the Pension Fund for 2012 and 2013. Lauterbach & Amen then assigned this task to Schroeder, who testified about what a contribution of zero dollars would do to a pension fund:

> "Contribution of zero dollars would increase the unfunded liability of a pension fund. If you look at the current—the prior year recommended contribution, whatever that dollar figure was, versus a contribution of zero, that difference is what's called unexpected

unfunded accrued liability that comes in in the next year. So that unexpected unfunded liability adds to whatever unfunded liability already existed from last year to this year that we already knew was there."

Schroeder further explained that a municipality that continues to make no contribution to a pension fund would result in an increase of the annual required contribution going forward.

¶ 79    Schroeder explained why municipalities should contribute the annual actuarial requirement every year:

"The idea behind contributing the annual actuarial requirement each year is that you can—to some extent you can manage the increase in cost over time. So if you set up, for example, an actuarial requirement that's going to increase at four-and-a-half or five percent per year, then you have some predictability as to those contributions if those contributions are being made over time. If those contributions are not made, then you have much more volatility and you see more rapid increases in the contribution calculations and annual actuarial requirements over time."

Putting these ideas together, Schroeder, when asked whether Harvey's failure to contribute at least the minimum annual actuarial requirement to the Pension Fund was concerning to him, testified:

"Yes. *** One thing that jumps out is that right now the cash flow out greatly exceeds the cash flow that's coming in. The benefit payments that are being paid out of the [Pension Fund] are close to 20 percent of the [Pension Fund's] assets. So the dollars that are coming in from employees and investment income is not enough to offset that, so we're seeing a declining asset base each year."

¶ 80                                    10. Daniel Mumpher

¶ 81    Daniel Mumpher, the Director of Local Government in the Illinois Comptroller's Office, testified that he is in charge of managing the reporting process of local governments throughout the State of Illinois. This includes the intake of annual financial reports, annual audits, and tax increment reports. Mumpher testified that municipalities in Illinois are required to submit annual financial reports to his office within six months of the end of their respective fiscal years.

¶ 82    Mumpher testified that Harvey filed its annual financial report for 2005 on July 31, 2006, its annual financial report for 2006 on July 6, 2007, its annual financial report for 2007 on April 8, 2008, and its annual financial report for 2008 on November 15, 2011. He further testified that Harvey's annual financial reports for 2009, 2010, 2011, and 2012 were all filed on November 1, 2013. However, Mumpher testified that he had not received an annual financial report from Harvey for the year 2013 or after.

¶ 83    Additionally, Mumpher testified that, while he had received an annual audit for fiscal year 2009, he did not receive it until December 16, 2013. However, Harvey has not filed an annual audit for fiscal years 2010, 2011, 2012, or 2013. Mumpher testified that he is concerned that Harvey has either not timely filed or has not filed at all the annual financial reports and annual audits for several years. Both these reports are statutorily required; however, Harvey has not timely filed for multiple years. Mumpher testified that Harvey is one of approximately 20 municipalities that are multiple years behind on these reports.

¶ 84    Due to Harvey's lack of filing, Mumpher testified that his office had issued several requests for Harvey to file these reports with his office. As a result of the continued delinquency of these reports, Mumpher's office has issued multiple fines against Harvey. He testified that he is unsure of the exact amount, but the total is more than $10,000 at this point.

¶ 85    Mumpher testified that Harvey reported that it paid $1,513,003 to the Pension Fund during fiscal year 2005, $1,580,608 during fiscal year 2006, $0 in fiscal year 2007, $1,761,830 during fiscal year 2009, $0 during fiscal year 2010, $0 during fiscal year 2011, and $1,761,830 during fiscal year 2012.

¶ 86                              11. Scott Brandt

¶ 87    Scott Brandt, an actuary with the Illinois Department of Insurance, testified that he is familiar with article 4 of the Code, which establishes firefighter's pension funds for municipalities based on their population. Brandt testified that the Code:

> "dictates a methodology in which the actuary is to use [when determining pension contributions]. It dictates the time frame under which the unfunded is to be paid off and the method in which that unfunded is to be calculated. It dictates that the assets are to be smoothed over a five-year period. It dictates that the unfunded—or the fund only needs to be funded to a 90 percent level by the end of period dictated under the statute which is in 2040."

¶ 88    Brandt then examined actuarial valuation reports produced by the Department of Insurance for the Pension Fund for the fiscal years 2004 through 2010. The preparation of these reports involves examining the documents submitted to his office by the Pension Fund. Then, his department sends the report through an "electronic check" that ensures the information is fairly accurate. This program then "computes the liability, the actual liabilities, compares the two, comes up with a shortfall if that is the case." The shortfall is then amortized over a period to ensure it is paid off. Brandt further testified that his department used a funding method called "entry age normal cost" for the earlier actuarial valuation reports. However, the Code changed the calculation method to projected unit credit, which "projects the liabilities in a different method."

¶ 89    Examining an actuarial experience study from September 26, 2012, Brandt testified that the Department of Insurance commissioned this report to determine the effects of the change in article 4 of the Code in 2011. This study was used to determine how the actuarial assumptions needed to be reviewed and changed to be in line with the new law. The report provided the Department of Insurance updated assumptions to use when conducting its valuations.

¶ 90    Next, Brandt examined a biannual public pension report for the State of Illinois for years 2011 through 2013. Examining this report, Brandt testified that Illinois public pensions were 54.3% funded in 2011. However, the pension funds were only 49% funded in 2013 when the report was published.

¶ 91                   VI. Harvey's Motion for Summary Judgment

¶ 92    In its motion for summary judgment, Harvey argued that the Pension Fund is not on the verge of default or imminent bankruptcy and, therefore, Harvey is not liable to the Pension Board. In addition, Harvey argued that the Pension Board's action is barred by *laches* and

separation of powers and that the Pension Board lacks the authority to sustain this lawsuit.[3] Additionally, Harvey argued that, even if the foregoing is incorrect, the Pension Board's claims for damages are still wholly unreasonable.

¶ 93                    A. The Verge of Default or Imminent Bankruptcy

¶ 94      Harvey argued that the Pension Fund is not on the verge of default or imminent bankruptcy.[4] In support, it attached the deposition transcript of Calene Zabinski, "who performs annual audits for around 20 Illinois police and firefighters' pension funds, and who has knowledge of the state of other police and firefighters' pensions." Zabinski testified that, in her experience, only in rare instances are pension funds fully funded.

¶ 95                          B. Reasonableness of Damages
¶ 96                        1. The Most Recent Actuarial Valuation

¶ 97      Harvey argues that, under the Code, municipalities are required only to levy "a sum sufficient to meet the annual actuarial requirements of the pension fund." 40 ILCS 5/4-118(a) (West 2014). To achieve this goal, the Code provides a two-step process: (a) funding the normal cost of the pension fund and (b) providing the annual amount required to bring the total assets of the pension fund up to 90% by fiscal year 2040. 40 ILCS 5/4-118(a) (West 2014). Based on this, Harvey argued that the second portion of that formula, "an annual amount sufficient to bring the total assets of the pension fund up to 90% of the total actuarial liabilities *** by the end of [the] municipal fiscal year 2040," takes into account underfunding of the pension fund and changes based on the contributions of previous years. 40 ILCS 5/4-118(a) (West 2014).

¶ 98      To support this argument, Harvey attached the discovery deposition transcript of Todd Schroeder, the Pension Fund's actuary. Schroeder testified that actuarial valuations would be different based on funding from prior years. Therefore, the underfunding of previous years is taken into account when determining each year's actuarial valuation. For this reason, Harvey argued that the Code "only asks municipalities to contribute the recommended amount from the most recent actuarial valuation, not the sum of prior actuarial valuations."

¶ 99      Additionally, Harvey attached the discovery deposition transcript of Scott Brandt, a representative of the Illinois Department of Insurance. Harvey cited the following exchange:

> "Q. Does the Public Pension Division have a position on whether a municipality that did not fund its Firefighters' Pension Fund in the fiscal year April 13, 2013, does it have a position on whether that municipality would owe the recommended contribution for the fiscal year ending April 30th, 2014, or whether it would owe that recommended contribution plus the prior recommended contribution?

---

[3]The affirmative defenses arguments for *laches*, separation of powers, and lack of authority made before this court are substantially similar to those made before the trial court. Therefore, these arguments will be discussed in the Analysis portion of this opinion.

[4]Harvey's argument that the Pension Board is not on the verge of default or imminent bankruptcy is the same in its motion for summary judgment as on appeal. Therefore, we will cover the majority of this argument in the Analysis section rather than here. *Infra* ¶¶ 172-205.

A. The Public Pension Division's position would be that the municipality would only need to fund the amount computed under a 2014 actuarial valuation.

Q. Why is that the Public Pension Division's position?

A. Actuarially speaking, the 2013 nonfunded amount is taken into consideration when calculating the 2014 liabilities and unfunded amounts."

Harvey argued that, based on this interpretation of article 4, even if the Pension Board had a claim against Harvey for underfunding, Harvey was liable only for the most recent actuarial valuation, not all prior valuations combined.

### 2. Recovery for 2009, 2010, or 2012

Harvey argued that the Code requires an enrolled actuary to calculate the annual actuarial valuation every year; therefore, because an enrolled actuary did not perform a valuation for years 2009, 2010, and 2012, the Pension Board cannot recover for those years. In its motion for summary judgment, Harvey included the following table:

| Fiscal Year | Actuary 1 | Actuarial Requirement | Actuary 2 | Actuarial Requirement | Source(s) |
|---|---|---|---|---|---|
| 2005 | Scott Brandt | $876,692 | Tim Sharpe | $880,632 | Pension Fund Valuation 2005 |
| 2006 | Scott Brandt | $980,024 | Tim Sharpe | $945,580 | Pension Fund Valuation 2006 |
| 2007 | Scott Brandt | $1,060,727 | Tim Sharpe | $1,061,219 | Pension Fund Valuation 2007 |
| 2008 | Scott Brandt | $1,140,932 | Tim Sharpe | $1,077,837 | Pension Fund Valuation 2008 |
| 2009 | Scott Brandt | $1,294,791 | None | | Pension Fund Valuation 2009 |
| 2010 | Scott Brandt | $1,574,792 | None | | Pension Fund Valuation 2010 |
| 2011 | Scott Brandt | $1,611,369 | Tim Sharpe | $1,558,762 | Pension Fund Valuation 2011 |
| 2012 | None | | None | | 2013 Biannual Pension Report |
| 2013 | Todd Schroeder | $1,531,760 | None | | Pension Fund Valuation 2013 |

Harvey argued that, in 2009 and 2010, only Brandt performed the actuarial valuation. However, according to Brandt's deposition testimony and a copy of a list compiled by the Internal Revenue Service of Active Enrolled Actuaries, Brandt is not an enrolled actuary.[5]

---

[5]The Code states an enrolled actuary is an actuary "(1) who is a member of the Society of Actuaries or the American Academy of Actuaries; and (2) who is enrolled under Subtitle C of Title III of the Employee Retirement Income Security Act of 1974 [(29 U.S.C. § 1241 (2012))], or who has been

Harvey argued that no annual actuarial valuation was performed by an enrolled actuary for 2009 and 2010 as required by the Code, so therefore it cannot be liable for any damages during these years. Additionally, no annual actuarial valuations took place during 2012. Therefore, Harvey argues that it cannot be liable for damages during 2012 either.

¶ 103     In support of its motion, Harvey attached the deposition transcript of Jon Willhite, the Pension Fund's financial consultant, who testified that the amount of damages should be $12,267,438, based on his calculations. Harvey also attached the deposition transcript of Sandor Goldstein, an actuary, who testified that Willhite's calculations were deficient. Harvey argued that, based on Goldstein's calculations, the maximum amount of damages should be $10,009,403.

¶ 104                    C. Pension Board's Motion to Compel Enforcement of the
                                          Settlement Agreement

¶ 105     The parties disagreed as to whether Harvey violated the following clause of the 1996 settlement agreement:

> "that in the future, any property taxes levied or personal property replacement taxes received on behalf of the [Pension Fund], which are assessed, collected and remitted to [Harvey] by the Cook County Treasurer's Office, shall be paid to the [Pension Fund] within 30 days of receipt by [Harvey], and not used by [Harvey] for any other corporate purposes as required by [the Code]."

¶ 106     Harvey argues that it did not fail to remit levied funds to the Pension Fund because it never collected the money levied for the funds. Harvey presented the following tables to support this argument:

| Fiscal Year | Total General Levy | Total Pension Fund Levy | Total Actually Collected | Shortfall |
|---|---|---|---|---|
| 2005 | $6,837,195 | $0 | - | - |
| 2006 | $6,837,195 | $0 | - | - |
| 2007 | $6,832,504 | $480,632 | $5,907,424 | $925,080 |
| 2008 | $7,952,086 | $1,061,219 | $5,208,438 | $2,743,648 |
| 2009 | $7,952,086 | $1,061,219 | $7,551,900 | $400,186 |
| 2010 | $8,759,841 | $350,000 | $7,834,933 | $924,908 |
| 2011 | $9,633,132 | $0 | - | - |
| 2012 | $9,975,330 | $0 | - | - |
| 2013 | $10,771,419 | $0 | - | - |

| Fiscal Year | Total General Levy | Total Pension Fund Levy | Total Actually Collected | Shortfall |
|---|---|---|---|---|
| 2005 | $6,837,195 | $0 | - | - |

engaged in providing actuarial services to one or more public retirement systems for a period of at least 3 years as of July 1, 1983." 40 ILCS 5/4-118(e) (West 2014).

- 18 -

| 2006 | $6,837,195 | $0 | - | - |
|------|------------|-----|---|---|
| 2007 | $6,832,504 | $480,632 | $5,907,424 | $925,080 |
| 2008 | $7,952,086 | $1,061,219 | $5,208,438 | $2,743,648 |
| 2009 | $7,952,086 | $1,061,219 | $7,551,900 | $400,186 |
| 2010 | $8,759,841 | $350,000 | $7,834,933 | $924,908 |
| 2011 | $9,633,132 | $0 | - | - |
| 2012 | $9,975,330 | $0 | - | - |
| 2013 | $10,771,419 | $0 | - | - |

| Fiscal Year | Personal Property Replacement Taxes Received |
|-------------|----------------------------------------------|
| 2005 | $391,736 |
| 2006 | $501,237 |
| 2007 | $805,674 |
| 2008 | $888,081 |
| 2009 | $778,539 |
| 2010 | $646,436 |
| 2011 | $797,446 |
| 2012 | $703,326 |
| 2013 | $744,405 |
| 2014 | $780,142 |

¶ 107 Based on this information, Harvey argued that between 2007 and 2010, the years the Pension Board claims Harvey failed to remit the funds to the Pension Fund, "Harvey specifically levied $2,953,070 to be paid to the Pension Fund as part of its general corporate levy. [Citation.] However, during this same period, Harvey experienced a shortfall in its collections and collected $4,993,822 less than it had levied." For this reason, Harvey argued that it never collected the funds intended for the Pension Fund and, therefore, Harvey could not remit funds to the Pension Fund that it did not receive.

¶ 108 VII. Response to the Motions for Summary Judgment

¶ 109 Following the filing of both parties' motions for summary judgment, the trial court ordered both parties to submit their responses and replies, which they did. Then, on March 18, 2015, Harvey moved to supplement its motion for summary judgment in order to attach two settlement agreements, which Harvey felt impacted its financial status. Those settlement agreements were from two cases involving Harvey: City of Chicago v. City of Harvey, No. 12 CH 44855 (Cir. Ct. Cook County), and SEC v. City of Harvey, No. 14-cv-7744 (Cir. Ct. Cook County). On April 14, 2015, the Pension Board also sought to supplement its motion for summary judgment with five additional exhibits, including (A) the actuarial valuation of the Pension Fund as of May 1, 2014; (B) the Pension Fund's UBS Asset Allocation Review as of March 4, 2015; (C) correspondence between the Illinois Municipal Retirement Fund and the

Illinois Department of Insurance dated March 17, 2015; (D) an April 3, 2015, Cook County circuit court judgment order assessing damages for the Harvey Police Pension Fund against Harvey in the amount of $7,334,181.88; and (E) Harvey's mayor's campaign brochure entitled "Re-Elect—A Lifetime of Commitment" in which he states that Harvey is in better financial shape than it has ever been and that all outstanding litigation has been settled.

¶ 110    In support of this motion, the Pension Board argued that the Pension Fund's net present assets have decreased since the last valuation: "As of March 4, 2015, the Pension Fund had only $10,936,532.72 in assets. According to the most recent actuarial valuation, the Pension Fund was only 27.18 percent funded as of May 1, 2014, and the Pension Fund's unfunded accrued liability has increased to nearly $30 million." Additionally, the Pension Board attached correspondence between the Illinois Municipal Retirement Fund and the Illinois Department of Insurance regarding the change in the Code which allows a form of "enforcement provision" relied on by Harvey in its motion for summary judgment. Specifically, this letter shows that the state comptroller is refusing to comply with the statutory provision; therefore, the Pension Board argued that "the enforcement provision in Article 4 is currently useless and it does not save the Pension Fund from default or bankruptcy."

¶ 111    The trial court granted both motions to supplement. Then, on June 5, 2015, the Pension Board filed an emergency motion to supplement, in which it sought to attach (1) the Illinois Supreme Court decision of *In re Pension Reform Litigation*, 2015 IL 118585 (*Heaton*), and (2) House Bill 3484 and Senate Amendment No. 1.[6]

¶ 112    On June 9, 2015, the trial court granted the emergency motion to supplement.

¶ 113                              VIII. Trial Court's Order

¶ 114    On June 25, 2015, the trial court granted the Pension Board's motion for summary judgment as to count I for declaratory judgment and count III for injunctive relief and also granted the Pension Board's motion to compel enforcement of the settlement agreement. However, the court denied count II for a writ of *mandamus*.

¶ 115                         A. Harvey's Preliminary Defenses

¶ 116    First, the trial court determined that the Pension Board had authority to bring the claim and that *laches*, the statute of limitations, or separation of powers doctrine did not bar this claim. The court found that the Pension Board is an administrative body, which is a "separate and independent entity from the municipality in which it serves." The Pension Board is not a branch of the Harvey government, and therefore, it can maintain a suit against Harvey.

¶ 117                         1. *Laches* and Statute of Limitations

¶ 118    Harvey had argued that the Pension Board's suit was barred by either *laches* or the statute of limitations because the Pension Board waited to "bring suit for more than five years after first learning of the behavior of which it complains." Harvey argued that the Tort Immunity Act, which has a one-year statute of limitations, applies in this case. 745 ILCS 10/8-101(a)

---

[6]Harvey argued that the Senate amendments to the Code would remove any enforcement rights the Pension Fund would have been given pursuant to the Code, and that the amendments would negate the lawsuit.

(West 2014). However, the trial court found that the Tort Immunity Act applies only to civil tort actions, and was, therefore, not applicable in this case. Rather, the trial court determined that the statute of limitations was five years in accordance with section 13-205 of the Code of Civil Procedure. 735 ILCS 5/13-205 (West 2014). The trial court explained: "Due to the interplay between the actuarial valuation, fiscal year, tax levy and Pension Code, the Board could not have known of Harvey's failure to properly levy or contribute to the Fund for fiscal year 2005 until February 6, 2006. [Citations.] Thus, the board properly brought suit within the applicable five year statute of limitations."

¶ 119    The trial court found that to succeed on a claim of *laches*, "Harvey must show that it was misled or prejudiced by such delay, or pursued 'a course different from that which [it] would otherwise have taken. [Citation.]' " The trial court found that Harvey was not unknowingly accruing liability. Rather, Harvey was knowingly accruing liability, failed to utilize any formula to determine its contributions to the fund, and failed to fulfill its duty according to the Code. Additionally, the trial court cited the fact that, even after the suit was filed in 2010, Harvey continued its course of failure to contribute to the Pension Fund. Therefore, Harvey was not unknowingly accruing liability.

¶ 120                                      2. Separation of Powers

¶ 121    The trial court partially agreed with Harvey's argument regarding separation of powers. The trial court acknowledged that the judiciary branch has always been cautious when venturing into the world of taxation. However, the trial court found that when a municipality abuses its discretion in the enforcement of statutory provisions, the judiciary will step in to enforce the law. Accordingly, the trial court denied the Pension Board's claim for a writ of *mandamus*. On all other counts, the court denied the affirmative defense of separation of powers.

¶ 122                        B. Constitutional, Contractual, and Statutory
                                          Right to Funding

¶ 123    In reaching its finding, the trial court drew distinctions among (1) a constitutional right to funding, (2) a contractual right to funding, and (3) a statutory right to funding. The trial court found that article XIII, section 5, of the Illinois Constitution was the basis for both (1) a constitutional and (2) a contractual right to funding:

> "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an *enforceable contractual relationship*, the benefits of which *shall not be diminished or impaired*." (Emphases added.) Ill. Const. 1970, art. XIII, § 5.

The trial court found that the Pension Fund must prove that it is on the verge of default or imminent bankruptcy to maintain an underfunding claim based on a constitutional violation under section 5. Ill. Const. 1970, art. XIII, § 5.

¶ 124    However, the trial court found that to determine whether a contractual right to funding exists requires an additional step, in which a pension fund must prove that it has "vested contractual rights to *** funding levels." *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220, 231 (1998). This level of proof requires "citing specific language in the [Code] that

- 21 -

demonstrates a legislative intent to establish a contractual right to funding." *Board of Trustees of the Riverdale Police Pension Fund v. Village of Riverdale*, 2014 IL App (1st) 130416, ¶ 38.

¶ 125     While the trial court found that both (1) a constitutional and (2) a contractual right were based on the constitution, the trial court also found that (3) a statutory right was derived directly from the Code itself. The trial court specified that, even if a statute does not create vested rights, the statute can still create a legal obligation that a party must follow.

¶ 126                          1. Constitutional Right to Funding

¶ 127     The trial court focused on whether pension funds, in general, have a constitutional right to funding, and found, based on *Riverdale*, 2014 IL App (1st) 130416, and *Sklodowski*, 182 Ill. 2d 220, that they do not have that right. Rather, the trial court found that pensioners have a right to receive benefits from a pension fund once their interest vests. As a result, the trial court found that a fund cannot demand funding *unless* the fund is "on the verge of default or imminent bankruptcy *** such that pension benefits were being impaired." (Internal quotation marks omitted.) *Riverdale*, 2014 IL App (1st) 130416, ¶ 31. However, the trial court observed that "by the time that a pension fund is on the verge of default, the deficiency in the pension payments is certain to be quite large and the likelihood of the public employer's ability to pay is certain to be quite small."

¶ 128     The trial court then attempted to determine whether this Pension Fund was or was not on the verge of default or imminent bankruptcy but, in the end, the trial court left that decision for a higher court[7] to determine because "[n]o court in this State ha[d] yet" made this ruling:

> "In this case, [Harvey] is undoubtedly in a state of near crisis. The parties have produced ample discovery and deposition testimony describing the deficient payments by Harvey over the years. If Harvey continues to underfund and often contribute zero or minimal dollars to the Fund, it will most certainly be at risk of denying benefits within the next five to ten years. However, throughout Illinois, municipalities, police and firefighters' pension funds are underfunded. *** Harvey points out that many other municipal pension funds are severely underfunded. For example, as of fiscal year 2012, the Chicago Firefighters' Pension was 24.4% funded, the Downstate Fire Pension was 55.5% funded, and the Village of Stone Park's Police Pension was 7% funded. No court in this State has yet equated these funding deficiencies with a constitutional violation. Thus, this Court concludes that the severe underfunding of the Fund in this case does not equate with the 'verge of default or imminent bankruptcy' necessary to find a constitutional violation."

¶ 129     In addition, the trial court observed (1) that Joseph Letke is no longer Harvey's comptroller, (2) that the Harvey Police Pension Fund was recently awarded a $7 million judgment against Harvey for underfunding, and (3) that the Code now includes a provision that allows the Pension Board to bring an action to collect a portion of the deficiency directly from the state. 40 ILCS 5/4-118(b-5) (West 2014). Taking these things together, the trial court found that, although Harvey's finances were "in sorry shape," this evidence did not rise to the level necessary to "meet this draconian 'verge of default or imminent bankruptcy' standard."

---

[7]On January 11, 2016, the trial court stated: "hopefully the appellate court can consider it because may[be] this is the case in which the standard for *** [on the verge] is met."

¶ 130                          2. Contractual Right to Funding

¶ 131    The trial court found that the "Code itself does not create any contractual right to a certain level of funding." In reaching this finding, the trial court determined that it would presume[8] that the law did not intend to create a contractual right, so that a plaintiff has the burden of proving specific language within the Code, which establishes the legislature's intent to create a contractual right. Based on this presumption, the trial court found that the Pension Board did not fulfill the high burden necessary to prove it had a contractual right to funding based on the Code.

¶ 132                          3. Statutory Right to Funding

¶ 133    The trial court found that the Code did provide an enforceable statutory right to funding. In reaching this conclusion, the trial court drew a line between the state and the individual municipalities. Citing *Sklodowski*, the trial court examined a situation where the state legislature amended the funding requirements for an employee pension plan, as it is legally allowed to do. 182 Ill. 2d at 231. The trial court explained that "[a]lthough one might wish the legislature would acknowledge when it enacts legislation replacing previous statutory funding requirements, absent some contractual right or constitutional prohibition, the legislature retains the power to change such statutory policies by amendment."

¶ 134    In contrast to the state legislature, the trial court found that a municipality does not have the authority to amend or ignore a state statute. A city is required to levy "a tax at a rate which will produce a sum sufficient to satisfy the annual requirements of the *** pension fund." *People ex rel. Sweet v. Central Illinois Public Service Co.*, 48 Ill. 2d 145, 156-57 (1971). The trial court found that the state legislature did not intend to remove all discretion from the municipality in setting the levy every year. However, the state legislature intended for the municipality to set that levy in accordance with the Code. In sum, the trial court concluded:

> "while the statutory formula set forth in section 4-118(a) leaves Harvey some discretion and the Illinois legislature retains the power to alter such a formula through legislative action, Harvey must comply with the [Code] in effect for any given year. There can be no dispute that Harvey has completely failed to do this and that the discretion afforded [Harvey] has been completely abused."

The trial court found that Harvey had not followed the statutory formula and provided "absolutely no justification or formula to support the amount of its levy or its contribution for any fiscal year at issue in this case." For these reasons, the trial court found that Harvey violated the Pension Fund's statutory right as provided in the Code.

¶ 135    Based on the violation of the Pension Fund's statutory rights, the trial court granted the Pension Board's request for declaratory judgment and injunctive relief. However, the trial court denied its request for a writ of *mandamus*. In calculating damages, the trial court determined "that, if Harvey had actually funded the full amount in any fiscal year, the actuarial requirement in the following year would be lower because the unfunded liability would be lower." The trial court assessed damages of $10,009,403 against Harvey.

---

[8]The legal support for this presumption is discussed later in this opinion at *infra* ¶ 170.

¶ 136                    C. Motion to Compel Enforcement of the
                                    Settlement Agreement

¶ 137          With respect to the settlement agreement, the trial court first examined Harvey's
        affirmative defenses, which included claims that the settlement agreement is void and that the
        Pension Board waived its right to sue for enforcement of the settlement agreement. As to
        whether the agreement is void, the trial court found that the settlement agreement was simply a
        mirror of Harvey's statutory obligations pursuant to the Code. Therefore, because there is no
        illegal or unlawful purpose contained within it, the Pension Board has "every right to enforce,
        enjoin or enter into an agreement on behalf of the [Pension] Fund to compel Harvey's
        compliance with the law."

¶ 138          Next, Harvey argued that the Pension Board waived its right to enforce the settlement
        agreement, in that the Pension Board "lulled" Harvey into a false sense that the Pension Board
        would not be enforcing strict compliance with the settlement agreement. The trial court
        determined that, because Harvey's finances "were in complete disarray for much of the period
        at issue," that the Pension Board could not have known how much Harvey owed it because
        Harvey did not even know how much it was collecting in property taxes each year. Further, the
        trial court found that, "[g]iven the chaotic state of Harvey's finances, the [Pension] Board's
        failure to take action prior to filing this lawsuit in 2010 comes nowhere close to an intentional
        relinquishment of a known right."

¶ 139          The trial court then examined Harvey's argument that, because it collected less than it
        levied in property taxes, it was justified in not contributing the money to the Pension Fund.
        Harvey argues that it levied $2,953,070 for the Pension Fund, but that it collected $4,993,822
        less than its total levy. As such, the trial court had to determine whether Harvey was allowed,
        under the Code, to attribute the entirety of this deficiency to a single levy, namely the Pension
        Fund. The trial court found that, "under the Settlement Agreement, Harvey is entitled to
        attribute a proportionate amount of the deficiency in its collections to the Pension Fund. It is
        required now to pay in damages the specific amounts levied for the Pension Fund in fiscal
        years 2008, 2009 and 2010, less the percentage of that amount that represents the deficiency in
        collections of taxes for that fiscal year and also less any amount already contributed."

¶ 140          Additionally, the trial court found that the settlement agreement required that a percentage
        of the personal property replacement taxes that Harvey collected should have been contributed
        to the Pension Fund. Therefore, Harvey owed the Pension Fund 12.2% of all the personal
        property replacement taxes that Harvey received during the relevant years. Therefore, the trial
        court found that Harvey owed the Pension Fund $809,892 in unpaid personal property
        replacement taxes.

¶ 141                              D. Trial Court's Damage Finding

¶ 142          The trial court entered a judgment against Harvey for $10,009,403 in damages, plus
        $809,892 in unremitted personal property replacement taxes, plus an amount to be decided for
        unlevied taxes for the Pension Fund for the fiscal years of 2008, 2009, and 2010. Additionally,
        the trial court granted declaratory judgment and injunctive relief. The court set a date to
        determine the exact terms of the damages and to discuss the language that would control the
        injunction.

¶ 143                        IX. Motions to Calculate Damages and Determine
                                         Injunction Language

¶ 144        Due to the complexity of the case, the trial court allowed each party to prepare a motion regarding the total costs of the suit and the language of the injunction. The Pension Board filed a motion seeking an additional award of costs for $12,526.46, plus 5% prejudgment interest and 6% postjudgment interest on the total damages. On August 17, 2015, Harvey filed its response to the motion.

¶ 145        On September 22, 2015, the trial court issued its final damages order. The trial court found that the Pension Board was not entitled to prejudgment interest in accordance with section 2 of the Interest Act (815 ILCS 205/2 (West 2014)). However, the trial court did find that the Pension Board "is entitled to judgment against [Harvey] in the amount of $11,561,117.00 plus six percent (6%) postjudgment interest" in accordance with section 2-1303 of the Code of Civil Procedure. 735 ILCS 5/2-1303 (West 2014). Additionally, the trial court found that the Pension Board was entitled to an additional $2,694,000 "plus six percent postjudgment interest as a lesser included amount of the $1,561,117.00 in damages due to the Pension Board on its statutory claim and will only become relevant if the award of damages on the statutory claim is disturbed on appeal." See 735 ILCS 5/2-1303 (West 2014). Further, the trial court found that the Pension Board was entitled to $809,892 plus 6% postjudgment interest for unremitted personal property replacement taxes. See 735 ILCS 5/2-1303 (West 2014).

¶ 146        Also on September 22, 2015, the trial court issued its final injunctive order. This injunction required Harvey to "fully comply with the funding formula set forth in [section 4-118(a) of the Code], as that provision may be amended from time to time." Additionally, the injunction requires that, starting with the May 1, 2015, fiscal year, and every fiscal year thereafter, Harvey shall "annually approve a line-item property tax levy specifically for the [Pension Fund] as part of its annual property tax levy ordinance that must be approved and submitted to the Cook County Clerk's Office on or before the last Tuesday in December of each year." Further, that line-item property tax for the Pension Fund "shall equal a sum sufficient to meet the 'annual actuarial requirements' " as provided for in the Code.

¶ 147        The trial court specifically found that the line-item property tax levy for the Pension Fund must be listed on the annual property tax levy ordinance to ensure that the Cook County clerk's office remits the funds directly to the Pension Fund rather than to Harvey's general fund. If, however, the funds are remitted to Harvey's general fund, Harvey shall remit those funds to the Pension Fund within 14 days of receipt.

¶ 148        Additionally, on January 11, 2016, the trial court, during its final hearing on the case, made the following statements:

        "I will say for the record, for what it's worth—I'll say two things for the record. One is I think this case is just tragic on both sides and sort of a microcosm of what's going on with the pensions throughout the state and, you know, sort of an on steroids [sic] kind of way in terms of the inability of the municipality to meet the requirements that—to meet its promises. And I completely believe you, counsel, that it's not like you're spending money on frivolous things, you know. And I—so I just think it's tragic.

        And I do think that, perhaps, and I don't know, I mean, I'm glad you got this stuff in the record and hopefully the appellate court can consider it because may[be] this is the case in which the standard for *** [on the verge of bankruptcy or imminent default] is

- 25 -

met because everything that you predicted was going to happen has, unsurprisingly, in fact, happened. And, you know, the reality of these people ever getting paid under their pension is certainly at issue.

However, I think there was an obligation to make the funding even before then. So let's see what the appellate court has to say both about the stay and about the merits, but I am not going to grant the stay because I just don't think I have jurisdiction."

## X. The Appeal

On October 22, 2015, Harvey filed a notice of appeal, seeking (1) partial reversal of the May 24, 2013, order; (2) partial reversal of the August 23, 2013 order; (3) partial reversal of the June 25, 2015, order and opinion; (4) reversal of the September 22, 2015, corrected injunctive order; (5) reversal of the September 22, 2015, corrected damages order; and (6) reversal of all other orders entered in the case and which resulted in the prior orders. In response, on October 30, 2015, the Pension Board filed a notice of cross-appeal seeking (1) partial reversal of the August 23, 2013, order denying the Pension Board's motion to strike affirmative defenses I and II; (2) partial reversal of the June 25, 2015, order and opinion denying count II for a writ of *mandamus* and finding that the Pension Fund is not on the verge of default or imminent bankruptcy; and (3) other relief the court deems necessary.

This appeal followed.

## ANALYSIS

Both parties have presented multiple issues for this court's determination on appeal. The issues raised on appeal include (1) whether the trial court's determination that the Pension Fund is not on the verge of default or imminent bankruptcy was correct, (2) whether the trial court correctly determined that Harvey violated the Pension Fund's statutory rights, (3) whether the trial court correctly determined that Harvey breached the 1996 settlement agreement, (4) whether the trial court correctly calculated the damages, and (5) whether the trial court correctly rejected Harvey's affirmative defenses of separation of powers and *laches*.

For the following reasons, we affirm in part and reverse in part the trial court's findings. We affirm the trial court's findings on issues (2), (3), (4), and (5) in finding that Harvey violated the Pension Fund's statutory rights, that Harvey did violate the 1996 settlement agreement, that the trial court's calculation of damages is correct, and that Harvey's affirmative defenses were correctly rejected. However, we reverse the trial court's finding that the Pension Fund is not on the verge of default due to the blatant disregard for financial responsibility shown by Harvey towards the Pension Fund.

This court's findings in this regard are discussed below.

## I. The Pension Fund Is on the Verge of Default
## or Imminent Bankruptcy

The trial court specifically asked the appellate court to set the standard for what qualifies as on the verge of default or imminent bankruptcy. There is very little case law or interpretation as to what, exactly, the framers of the Illinois Constitution intended when they used this phrase.

To understand the meaning of "on the verge of default or imminent bankruptcy," a historical review of the Illinois Constitutional Convention is necessary. First, pension benefits

are protected by article XIII, section 5, of the Illinois Constitution. This section provides: "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5.

¶ 159    In reviewing the record of the proceedings of the Sixth Illinois Constitutional Convention, Delegate Kinney, who sponsored section 5, stated that the terms "enforceable" and "impaired" should be interpreted as follows:

> "To establish the record as to intent, I should just like to briefly say that the word 'enforceable' is meant to provide that the rights so established shall be subject to judicial proceedings and can be enforced through court action. The word 'impaired' is meant to imply and to intend that if a pension fund would be *on the verge of default or imminent bankruptcy*, a group action could be taken to show that these rights should be preserved." (Emphasis added.) 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2926 (hereinafter Record of Proceedings).

Additionally, Delegate Kinney defined the word "diminished":

> "Benefits not being diminished really refers to this situation: If a police officer accepted employment under a provision where he was entitled to retire at two-thirds of his salary after twenty years of service, that could not subsequently be changed to say he was entitled to only one-third of his salary after thirty years of service, or perhaps entitled to nothing. That is the thrust of the word 'diminished.' It was not intended to require 100 percent funding or 50 percent or 30 percent funding or get into any of those problems, aside from the very slim area where a court might judicially determine that imminent bankruptcy would really be impairment." 4 Record of Proceedings 2929.

¶ 160                              A. Illinois Supreme Court Cases

¶ 161                  1. *People ex rel. Illinois Federation of Teachers v. Lindberg*, 1975

¶ 162    A few years after the new constitution was ratified, our Illinois Supreme Court considered a case involving multiple class action lawsuits by members of several teachers' pension funds (Teachers). *People ex rel. Illinois Federation of Teachers v. Lindberg*, 60 Ill. 2d 266, 268 (1975). The Teachers sought declaratory relief claiming that an appropriation reduction by the governor of three pension funds that the Illinois General Assembly had appropriated monies for was unconstitutional. *Lindberg*, 60 Ill. 2d at 268. The Governor had reduced the total appropriation amount from $330.215 million to $143.19 million. *Lindberg*, 60 Ill. 2d at 269.

¶ 163    The Teachers argued that section 5 of the constitution "create[d] a contractual relationship between the State and participants in the pension systems which the Governor may not infringe by use of his power to reduce or veto appropriations." *Lindberg*, 60 Ill. 2d at 271. In examining the debates of the constitutional convention, the supreme court determined that the framers did not intend to "require a specific level of pension appropriations during a fiscal period." *Lindberg*, 60 Ill. 2d at 272. Specifically regarding whether the Teachers had a contractual right to the initially appropriated monies, the supreme court found: " '[i]t has long been settled that compulsory participation in a statutory pension plan confers no vested rights, thus permitting amendment, change or repeal as the legislature sees fit.' " *Lindberg*, 60 Ill. 2d at 273 (quoting *Bergin v. Board of Trustees of the Teachers' Retirement System*, 31 Ill. 2d 566, 574 (1964)).

For this reason, the supreme court determined that the Teachers possessed no contractual right by statute to challenge appropriation reductions and have only contractual rights to their pension under the facts of that case. *Lindberg*, 60 Ill. 2d at 275.

¶ 164                              2. *McNamee v. State*, 1996

¶ 165        Twenty years later, in *McNamee v. State*, 173 Ill. 2d 433 (1996), our Illinois Supreme Court examined an amendment to the Code, which changed the funding scheme for pension funds. *McNamee*, 173 Ill. 2d at 435-36. The plaintiffs claimed that this amendment violated section 5 of the constitution because "it will allow municipalities to contribute lower initial annual contributions to the police pension funds, thereby making the funds less secure." *McNamee*, 173 Ill. 2d at 436-37. Relying on the constitutional convention transcript, the defendant argued that section 5 "only protects pension benefits and does not require any particular method of funding." *McNamee*, 173 Ill. 2d at 437.

¶ 166        In a detailed analysis of the constitutional convention transcript, the supreme court found that the framers intended "only to put state and municipal governments on notice that they may not abandon their pension obligations on the belief that such payments were gratuities. The clearly expressed intention of the framers was to protect public pension benefits, but not to control funding." *McNamee*, 173 Ill. 2d at 444. Based on this reasoning, the supreme court reaffirmed its commitment to invalidate amendments to the Code only if the amendment diminished benefits. *McNamee*, 173 Ill. 2d at 445. Since the amendment did not diminish the plaintiff's right to receive pension benefits and did not place the pension fund on the verge of default or imminent bankruptcy, the supreme court upheld the amendment. *McNamee*, 173 Ill. 2d at 446-47.

¶ 167                      3. *People ex rel. Sklodowski v. State*, 1998

¶ 168        A few years later, five plaintiffs from five separate state pension systems sued, alleging that Illinois was not in compliance with the funding provisions contained in the Code. *Sklodowski*, 182 Ill. 2d at 223. The defendants moved to dismiss because the claim required a judicial order to appropriate money to the pension fund which, the defendants argued, would violate the separation of powers clause of the Illinois Constitution. *Sklodowski*, 182 Ill. 2d at 224.

¶ 169        Our supreme court found that there is a presumption that "laws do not create private contractual or vested rights, but merely declare a policy to be pursued until the legislature ordains otherwise." *Sklodowski*, 182 Ill. 2d at 231. Therefore, "[a] party asserting that a law creates a contractual right bears the burden of overcoming this presumption." *Sklodowski*, 182 Ill. 2d at 232. As a result, the supreme court affirmed its holding in *Lindberg*, 60 Ill. 2d 266, which found that the Code does not establish a vested contractual right to statutory funding levels.

¶ 170        Next, the *Sklodowski* plaintiffs argued that their benefits were at risk of being diminished. *Sklodowski*, 182 Ill. 2d at 232. The supreme court found that the plaintiffs had "alleged only an opinion that present funding levels are insufficient, from a prudential standpoint, to meet the accrued future obligations of the funds. The claims contain *no factual allegations* that would support a finding that the funds at issue are 'on the verge of default or imminent bankruptcy' such that benefits are in immediate danger of being diminished." (Emphasis added.) *Sklodowski*, 182 Ill. 2d at 233. For these reasons, the supreme court determined that the

plaintiffs neither had a vested contractual right or a constitutional right to enforce statutory funding levels under the facts of that case. *Sklodowski*, 182 Ill. 2d at 233.

¶ 171                    4. *In re Pension Reform Litigation* (*Heaton*), 2015

¶ 172    In the *Heaton* case, our Illinois Supreme Court was asked to determine the constitutionality of an amendment (Pub. Act 98-599 (eff. June 1, 2014)) to the Code. *Heaton*, 2015 IL 118585, ¶ 1. This amendment reduced the retirement annuity benefits for four of the five main Illinois state-funded pension funds. *Heaton*, 2015 IL 118585, ¶ 1.

¶ 173    In discussing contributions, the supreme court highlighted Delegate Green's comments during the Illinois Constitutional Convention, in which he stated that section 5 protects public pensions by mandating a contractual relationship between the employee and the employer and ensuring that the state cannot impair or diminish pensioners' right to receive their benefits. *Heaton*, 2015 IL 118585, ¶ 15. However, the supreme court notes that Delegate Green's hope that this constitutional provision would induce the General Assembly to fund the pensions was unfulfilled. *Heaton*, 2015 IL 118585, ¶ 17. In quoting a Securities and Exchange Commission cease and desist action, the court found that Illinois has been funding its pensions using an approach that had no relation to actuarial calculation of liability. *Heaton*, 2015 IL 118585, ¶ 17.

¶ 174    Nonetheless, in 1995, the General Assembly passed a funding plan that "called for the legislature to contribute sufficient funds each year to ensure that its contributions, along with the contributions by or on behalf of members and other income, would meet the cost of maintaining and administering the respective retirement systems on a 90% funded basis in accordance with actuarial recommendations by the end of the 2045 fiscal year." *Heaton*, 2015 IL 118585, ¶ 19. However, "[b]y the end of June 2013, the five State-funded retirement systems contained a total of only 41.4% of the funding necessary to meet their accrued liabilities based on the market value of fund assets." *Heaton*, 2015 IL 118585, ¶ 21 (citing Commission on Government Forecasting & Accountability, Illinois State Retirement Systems: Financial Condition as of June 30, 2013, at 27 (Mar. 2014)).

¶ 175    Due to the problems facing the state-sponsored retirement systems, the General Assembly passed an amendment to the Code, which was the subject of the appeal. *Heaton*, 2015 IL 118585, ¶ 25. Although there are many pieces to this amendment, the biggest section at issue was a "comprehensive set of provisions designed to reduce annuity benefits for members *** entitled to Tier 1 benefits, *i.e.*, members who belonged to those systems prior to January 1, 2011." *Heaton*, 2015 IL 118585, ¶ 27. As a result, the plaintiffs filed suit alleging that, among other things, the amendment violated article XIII, section 5, of the Illinois Constitution. *Heaton*, 2015 IL 118585, ¶ 35.

¶ 176    Our supreme court found that, under section 5, members of a pension have a "legally enforceable right to receive the benefits they have been promised." *Heaton*, 2015 IL 118585, ¶ 46. "[O]nce an individual begins work and becomes a member of a public retirement system, any subsequent changes to the Pension Code that would diminish the benefits conferred by membership in the retirement system cannot be applied to that individual." *Heaton*, 2015 IL 118585, ¶ 46. As such, the supreme court found that this amendment would result in the diminishment of the pensioners' pension benefits; therefore, it was in violation of the Illinois Constitution. *Heaton*, 2015 IL 118585, ¶ 47. *Hannigan v. Hoffmeister*, 240 Ill. App. 3d 1065 (1992); *Kuhlmann v. Board of Trustees of Police Pension Fund*, 106 Ill. App. 3d 603 (1982);

*Thompson v. Retirement Board of Policemen's Annuity & Benefit Fund*, 379 Ill. App. 3d 498 (2008); *In re Marriage of Winter*, 387 Ill. App. 3d 21 (2008).

¶ 177                        B. "Verge of Default or Imminent Bankruptcy"

¶ 178    As is apparent, neither the Illinois constitutional framers nor the Illinois Supreme Court have completely defined what qualifies as "on the verge of default or imminent bankruptcy." The framers established the standard in reference to section 5, and the supreme court has referenced the standard in multiple cases; however, the standard has never been applied to a "real-world" case to find that a fund is on the verge of default or imminent bankruptcy. Nor, as far as this court is aware, has any Illinois court ever found a pension fund to have fallen so far as to have satisfied this "draconian" standard, as the trial court referred to it.

¶ 179    The best indication of a drafter's intent is the language that he chose to use, as given its plain and ordinary meaning. See People v. Davidson, 233 Ill. 2d 30, 40 (2009). When a drafter uses terms that are otherwise undefined, "it is entirely appropriate to employ a dictionary to ascertain the plain and ordinary meaning of those terms." Davidson, 233 Ill. 2d at 40. Therefore, in order for this court to determine what "on the verge of default or imminent bankruptcy" means, we first look to the dictionary. "Verge" is defined as "sink[ing] to a point." Webster's Third New International Dictionary 2543 (1971). "Default" means "to fail to fulfill an obligation" (Webster's Third New International Dictionary 590 (1971)), and "imminent" means "ready to take place" (Webster's Third New International Dictionary 1130 (1986)).

¶ 180    The Pension Fund is not ready to file bankruptcy, nor are its beneficiaries ready to file bankruptcy because they are still being paid. So in our analysis, we must determine whether the subject Pension Fund is on the verge of default. In *Sklodowski*, our supreme court instructed that, to support a finding that the funds are on the verge of default (or imminent bankruptcy), the benefits must be "in immediate danger of being diminished." *Sklodowski*, 182 Ill. 2d at 233. This court finds that the fund-supported benefits are already impaired and shortly they will be diminished because the benefits are being supported primarily by the contributions of the firefighters. In other words, when a firefighter makes a contribution to the Pension Fund, that current firefighter expects that his money and the money contributed by Harvey will be available to him at his retirement. Without Harvey's contribution, there will be no pension for him in the future or his pension will be substantially diminished within a short time. We look at certain factors in evidence in this case in making that determination.

¶ 181    First, we look at what the Pension Fund's financial history reveals. We start that history in 2005 because the evidence in this case starts with figures from 2005. In 2005 and 2006, Harvey did not levy for the Pension Fund but in 2005 paid $9,885 into the fund and $38,304 in 2006. However, what is revealing is that the Pension Fund paid out $1,435,138 in 2005 and $1,502,894 in 2006.

¶ 182    In 2007, Harvey levied for $480,632 and paid into the Pension Fund $615,407, while paying out $1,633,677. In 2008 and 2009, Harvey levied for $1,061,219 in each year and paid $771,471 into the Pension Fund in 2008 and $18,181 in 2009, while paying out $1,740,481 in 2008 and $1,761,830 in 2009. In 2010, Harvey levied $350,000 and paid $5143 into the Pension Fund, while paying out $1,812,963. In 2011, 2012, and 2013, Harvey failed to levy for

the Pension Fund and paid in nothing each year but paid out $1,827,420 in 2012 and $1,879,693 in 2013.[9]

¶ 183    If this trend continues, the Pension Fund will be paying out increased benefits each year and receiving nothing in contributions from Harvey. As noted, the Pension Fund is surviving on the contributions paid into the plan by the firefighters and the interest and other money received on the funds invested. Once the funds in the pension are diminished to a point, the fund will not be able to pay benefits and that point can be in less than five years, and there will be a point where the Pension Fund will be so diminished that Harvey could never contribute enough money to make the Pension Fund a viable pension plan again.

¶ 184    Based on the expert testimony, we find that the Pension Fund is in a precarious position. Jon Willhitte, the Pension Fund's financial consultant since the 1980s, opined in his testimony that the Pension Fund is being forced to sell assets to pay the beneficiary's current pension benefits. Willhitte testified that, if the tax levy is not reinstated, the Pension Fund is going to experience "dire, dire problems." Willhitte opined that the Pension Fund is being forced to sell assets to pay the beneficiaries, and that the time when there is no money left in the plan is shorter than the life expectancy of the retirees. Calene Zabinski, a CPA who works as a financial director and treasurer for various municipalities across the state, testified that "the continued underfunding, coupled with that increase in the rate of pay higher than actuarial assumption, eventually will get to the point where [Harvey] is going to have to pay for the pensioners." James Ritchie, a CPA who worked directly with the Pension Fund, was concerned for the Pension Fund's financial viability. He testified:

> "With statutorily required increases in benefits being paid out as well as the expenses and then the lack of municipal funding that is coming in, it looks that the assets are slowly being depleted to pay out benefits as required by statute. Without municipal funding I would say, in an estimation, the [Pension Fund] will begin to have difficulty paying out benefits by the end of this decade."

Ritchie testified that Harvey collected approximately $400,000 on behalf of the Pension Fund but paid none of those funds between 2007 and 2013. As of March 4, 2015, the Pension Fund had only $10,936,532.72 in assets. According to the most recent actuarial valuation, the Pension Fund was only 27.18% funded as of May 1, 2014, and the Pension Fund's unfunded accrued liability has increased to nearly $30 million.

¶ 185    Second, we look at Harvey's financial condition. The evidence has revealed that Harvey has gone without an audit or the filing of an annual financial report for a number of years. Specifically, Harvey has not undergone an audit for the fiscal years 2010, 2011, 2012, or 2013. Maggie Britton, one of the two comptrollers for Harvey, testified that, since Harvey has not obtained audits, they cannot complete their annual financial reports. Britton further testified that Harvey received $805,674 in personal property replacement taxes for 2007, $888,081 for 2008, $778,539 for 2009, $649,436.17 for 2010, and $797,445.69 for 2011, but Harvey failed to contribute any of the personal property replacement tax revenue to the Pension Fund during these years. In addition, Harvey appropriated monies for the Pension Fund that were not paid: $300,000 annually in 2005 and 2006, $1180.63 in 2007, $197,000 in 2008, $1,161,219 in 2009, $1,161,219 in 20101, $0 in 2011, $480,000 in 2012, $450,000 in 2013, and $1,781,542 in 2014.

---

[9]The briefs do not disclose what was paid out in 2011.

¶ 186     The evidence further disclosed that Joseph Letke, the official comptroller for Harvey since 2003, invoked his fifth amendment privilege against self-incrimination 178 times and refused to answer questions concerning Harvey's financial conditions regarding (1) fraudulent and misleading bond offerings, (2) a developer who collected bond proceeds from Harvey then fled to India, (3) the accusation that Letke collected fees from both Harvey and the developer that fled to India, (4) why each Harvey alderman had an $80,000 unmonitored expense account, (5) why Harvey paid an alderman's son $325 an hour for snow removal, and (6) why Harvey paid the mayor's son $88,000 to develop a social media website. In addition, the United States Securities and Exchange Commission filed a complaint against Harvey and Letke, claiming misuse of proceeds raised from investors in municipal bonds issued by Harvey from 2008 to the present and that the bond money was used for a Holiday Inn hotel in Harvey and not for a governmental purpose. The complaint further alleged that "Harvey officials improperly diverted at least $1.7 million of bond proceeds from these offerings into the general operation accounts of Harvey to pay [Harvey's] operation costs, including payroll."

¶ 187     Third, we look at whether Harvey intends to correct the pension deficit in the future. Harvey has provided no plan to correct its handling of this pension crisis. Harvey has a complete lack of accountability now and in the past, and asserts that the Pension Fund's hemorrhaging of money is not in any way its fault.

¶ 188     Harvey relies heavily on the case of *Riverdale* to establish that the Pension Fund is not on the verge of default or imminent bankruptcy. 2014 IL App (1st) 130416. The case at bar is readily distinguishable from *Riverdale*, where the Riverdale Police Pension Fund (Police Fund) filed a suit seeking a declaratory judgment that the Village of Riverdale (Riverdale) had "breached its statutory funding obligations under [the Code] by failing to levy the appropriate taxes for pension contributions from 2000 to 2010." *Riverdale*, 2014 IL App (1st) 130416, ¶ 7. The Police Fund alleged that Riverdale had failed to follow the Illinois Department of Insurance recommended tax amounts "necessary to meet the municipal contribution requirements provided by the [Code]." *Riverdale*, 2014 IL App (1st) 130416, ¶ 8.

¶ 189     Riverdale admitted that it owed the Police Fund money and that, between 2003 and 2010, it admitted that Riverdale did not follow the tax levy issued by the Illinois Department of Insurance. *Riverdale*, 2014 IL App (1st) 130416, ¶ 9. Additionally, Riverdale admitted the following: "(1) for 2003, the recommendation was $432,261 and the Village levied $420,000; (2) for 2004, the recommendation was $473,860 and the Village levied $262,940; (3) for 2005, the recommendation was $486,673 and the Village levied $262,940; (4) for 2006, the recommendation was $603,772 and the Village levied $280,000; (5) for 2007, the recommendation was $651,990 and the Village levied $440,000; (6) in 2008, the recommendation was $754,607 and the Village levied $440,000; (7) in 2009, the recommendation was $849,300 and the Village levied $440,000; and (8) in 2010, the recommendation was $1,018,396 and the Village levied $866,168." *Riverdale*, 2014 IL App (1st) 130416, ¶ 9.

¶ 190     Both the Police Fund and Riverdale filed motions for summary judgment. *Riverdale*, 2014 IL App (1st) 130416, ¶¶ 10-11. The trial court granted Riverdale's motion for summary judgment and the Police Fund appealed. *Riverdale*, 2014 IL App (1st) 130416, ¶ 13. On appeal, this court, in a well-written opinion by Justice Lampkin, found that the Police Fund "did not provide evidence, nor even allege, the Pension Fund was on the 'verge of default or

imminent bankruptcy.' " *Riverdale*, 2014 IL App (1st) 130416, ¶ 40 (quoting *McNamee*, 173 Ill. 2d at 446-47).

¶ 191   An examination of the contributions to the Police Fund shed significant light on why *Riverdale* is distinguishable from the case at bar. In *Riverdale*, it is undisputed that Riverdale contributed the following to the Police Fund:

| Year | Annual Actuarial Requirement | Contribution | Percent of Annual Actuarial Requirement Contributed |
|---|---|---|---|
| 2003 | $432,261 | $420,000 | 97.2% |
| 2004 | $473,860 | $262,940 | 55.5% |
| 2005 | $486,673 | $262,940 | 54.0% |
| 2006 | $603,772 | $280,000 | 46.4% |
| 2007 | $651,990 | $440,000 | 67.5% |
| 2008 | $754,607 | $440,000 | 58.3% |
| 2009 | $849,300 | $440,000 | 51.8% |
| 2010 | $1,018,396 | $866,168 | 85.1% |

*Riverdale*, 2014 IL App (1st) 130416, ¶ 9. By contrast, when we examine the amounts contributed by Harvey to the Pension Fund, the differences are readily apparent:

| Fiscal Year | Annual Actuarial Requirement | Contribution | Percent of Annual Actuarial Requirement Contributed |
|---|---|---|---|
| 2005 | $876,692 | $9,885 | 0.01% |
| 2006 | $980,024 | $38,304 | 0.04% |
| 2007 | $1,060,727 | $480,632 | 45.31% |
| 2008 | $1,077,837 | $771,471 | 71.58% |
| 2009 | $1,294,791 | $18,181 | 1.40% |
| 2010 | $1,574,792 | $5,143 | 0.33% |
| 2011 | $1,611,369 | $0 | 0.00% |
| 2012 | N/A | $0 | N/A |
| 2013 | $2,036,497 | $0 | 0.00% |
| 2014 | $2,070,500 | $600,000 | 28.98% |

Although the Police Fund in *Riverdale* was underfunded, it was nowhere near the level of underfunding exhibited in this case. Even if we remove 2012 because Harvey disputes the annual actuary valuation for that year, Harvey still contributed less than 10% of the annual actuarial requirement six out of nine years.

¶ 192   Also, the Pension Board here presented the deposition testimony of experts in the field of accounting and actuary science, who opined that the Pension Fund is well on its way to insolvency. For example, Maggie Britton, one of Harvey's comptrollers and a CPA, testified

that the Pension Fund would be facing a shortfall. Jon Willhite, the Pension Fund's financial consultant, testified that Harvey owes the Pension Fund more than $12 million; that, without a tax levy contribution, the Pension Fund will experience "dire, dire problems"; and that the Pension Fund is his worst funded pension fund client. James Ritchie, a CPA, testified that the money going out significantly exceeds the money flowing back in. Therefore, it was his belief that the Pension Fund has approximately five years before it could be "completely insolvent." Even Sandor Goldstein, the expert hired by Harvey, testified that Harvey owed the Pension Fund over $10 million in accumulated contribution deficiency and provided no evidence or testimony that the Pension Fund has any possibility of recovery from its precarious position.

¶ 193     Harvey has presented no evidence that disproves that it is in financial disarray. Harvey does point out that Joseph Letke, its past comptroller, is no longer employed by them. However, Letke was employed for multiple years, allegedly issuing misleading and fraudulent bonds in the name of Harvey and allowing developers to flee the country with millions of Harvey's dollars. Even after the public disclosures concerning Letke were published, he still remained as Harvey's comptroller. Aside from these two events directly linked to Letke, his replacement has done nothing to put this court's mind at ease because there is still the alleged issues of Harvey aldermen's $80,000 unregulated expense accounts, paying the relatives of prominent city officials thousands of dollars for doing relatively simple tasks such as creating a social media website and shoveling snow. Harvey has presented no testimony and no evidence to demonstrate that it has the ability to manage its finances and properly fund the Pension Fund.

¶ 194     Combining the ever-decreasing assets in the Pension Fund, the consistent lack of contributions, and the lack of evidence to support a changing of financial habits by Harvey, this court is convinced that the Pension Fund is on the verge of default. To be clear, it is not merely the financial status of the Pension Fund that leads this court to this finding, and we understand that we are the first court to find in this manner. However, the compounding nature of the situation—including the precarious financial position of the Pension Fund based on multiple experts in relevant fields, the constant declarations by Harvey that it has not contributed to the Pension Fund's poor financial condition, and the continued lack of financial responsibility shown by Harvey over a significant period of time—has convinced this court that this case is a perfect example of a fund on the verge of default.

¶ 195     Although it is true that pension funds do not have a right to a specific level of funding, the framers of the Illinois Constitution intended to put the municipalities on notice that, if they completely abandoned their pension obligations, then the pensioners would be able to sustain a constitutional claim. *McNamee*, 173 Ill. 2d at 444. Therefore, if pensioners can prove that their rights to receive pension benefits are "diminished or impaired" in a way that places the pension fund on the verge of default, then an action alleging a violation of constitutional rights will be sustained. Ill. Const. 1970, art. XIII, § 5; *McNamee*, 173 Ill. 2d at 446. In order to prove that a pension fund is on the verge of default, our supreme court has found that the allegations must demonstrate more than "only an opinion that present funding levels are insufficient *** to meet the accrued future obligations of the funds." *Sklodowski*, 182 Ill. 2d at 233. Rather, a plaintiff must prove that the benefits are in immediate danger of being diminished or impaired. *Sklodowski*, 182 Ill. 2d at 233; *McNamee*, 173 Ill. 2d at 444. Based on the testimony from multiple witnesses, Harvey's blatant disregard for the Pension Fund over a long period of time, and the dwindling status of the Pension Fund assets, this court finds that the Pension Fund is on

the verge of default, which establishes a valid and enforceable constitutional right to funding. Harvey has set up a collision course over a period of many years where the beneficiaries of their firefighters' Pension Fund are being paid substantially out of the money that the firefighters have themselves contributed to the Pension Fund and the money the Pension Fund earns from investments, causing an ever increasing dissipation of the Pension Fund's assets, which will result in the fund having no assets to pay its beneficiaries or fulfill its obligations under the fund. In essence, Harvey is robbing Peter to pay Paul, but what happens when Peter retires?

¶ 196                                II. Statutory Right to Funding

¶ 197       The trial court found that the Code "does create a valid and enforceable statutory right" to funding. We affirm the trial court's finding that, although a municipality does retain discretion in the application of the Code, it must do so within the statutory formula determined by the Illinois legislature.

¶ 198       Illinois courts have made it clear that the Code does not create a contractual right to a certain level of funding. A party asserting that a statute creates a contractual right has a high burden of overcoming the presumption that laws do not create a contractual or vested right. *Sklodowski*, 182 Ill. 2d at 231. The Illinois Supreme Court and this court have determined that neither the history nor the language of the Pension Code support a claim that the Code establishes vested contractual rights to statutory funding levels. *Sklodowski*, 182 Ill. 2d at 232; *Lindberg*, 60 Ill. 2d at 274-75; *Riverdale*, 2014 IL App (1st) 130416, ¶ 38.

¶ 199       Section 4-118 of the Pension Code states:

> "the municipality *shall* annually levy a tax upon all the taxable property of the municipality at the rate on the dollar which will produce an amount which, when added to the deductions from the salaries or wages of firefighters and revenues available from other sources, *will equal a sum sufficient to meet the annual actuarial requirements of the pension fund*, as determined by an enrolled actuary ***. *** [T]he annual actuarial requirements of the pension fund are equal to (1) the normal cost of the pension fund, or 17.5% of the salaries and wages to be paid to [the] firefighters for the year involved, whichever is greater, plus (2) an annual amount sufficient to bring the total assets of the pension fund up to 90% of the total actuarial liabilities of the pension fund by the end of municipal fiscal year 2040[.]" (Emphases added.) 40 ILCS 5/4-118(a) (West 2014).

The word "shall" within the statute indicates that a municipality must levy a tax at a rate that "will equal a sum sufficient to meet the annual actuarial requirements of the pension fund." 40 ILCS 5/4-118(a) (West 2014). However, municipalities are allowed discretion in the amount it must levy to contribute to the pension fund. *Board of Trustees v. City of Rockford*, 96 Ill. App. 3d 102, 108 (1981) ("While the finance and reserve sections of the [Code] are clearly designed to ensure the financial integrity of these pension funds, we do not believe it was [the legislature's] purpose to remove all discretion from the city council in determining the dollar amount to be levied for these funds in any particular year ***."); *Riverdale*, 2014 IL App (1st) 130416, ¶ 36 (citing *Rockford*, 96 Ill. App. 3d at 108); *Board of Trustees of the Police Pension Fund v. City of Evanston*, 281 Ill. App. 3d 1047, 1051-52 (1996) (citing *Rockford*, 96 Ill. App. 3d at 108).

¶ 200       In *Sklodowski* and the United States Supreme Court cases that it cites, the courts have recognized that, where a statute does not create vested rights, it does create a legal obligation

that must be followed until it has been revised or repealed. *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985). The trial court in the case at bar made the following findings:

> "A municipality, however, has no equivalent power to ignore or amend a state statute. Indeed, the Illinois Supreme Court has long recognized that a city is required 'to levy a tax at a rate which will produce a sum sufficient to satisfy the annual requirements of the … pension fund.' *People ex rel. Sweet v. Cent. Ill. Pub. Serv. Co.*, 48 Ill. 2d 145, 156-57 (1971). In *Evanston* and *Rockford*, the courts recognized that while the funding provisions of the Pension Code were not intended to withdraw all discretion from local governments in determining the necessary dollar amount to be levied for these funds in any particular fiscal year, a municipality must comply with the requirements of the Pension Code in effect when setting its levy. *Evanston*, 281 Ill. App. 3d at 1054; *Rockford*, 96 Ill. App. 3d at 106.

> In short, while the statutory formula set forth in section 4-118(a) leaves Harvey some discretion and the Illinois legislature retains the power to alter such a formula through legislative action, Harvey must comply with the Pension Code in effect for any given year. There can be no dispute that Harvey has completely failed to do this and that the discretion afforded the City has been completely abused.

> During fiscal years 2011 through 2013, Harvey failed to levy or contribute *any* money whatsoever to the Fund in accordance with its obligations under section 4-118 of the Code. [(Emphasis in original.)] For 2005 and 2006 the City made some contributions but failed to specifically levy on behalf of the Pension Fund. This was despite the fact that section 4-118(b) provides that the tax for the Firefighters' Pension Fund 'shall be levied and collected in the same manner as the general taxes of the municipality, *** and shall be in addition to the amount authorized to be levied for general purposes ***.' 40 ILCS 5/4-118(b).

> In 2007, 2010 and 2014, Harvey imposed a specific levy but it was less than half of the amount that the AAR calculation would have suggested. This cannot possibly be a good faith attempt to meet the statutory requirements. In 2008 and 2009, although Harvey apparently levied a more significant amount on behalf of the Fund, the testimony is devoid of any mention of the statutory formula proscribed by the Code. [Citation.] Harvey had provided absolutely no justification or formula to support the amount of its levy or its contributions in any fiscal year at issue in this case.

> Moreover when Harvey did impose a specific levy, it failed to forward the amounts collected to the treasurer of the Board within 30 business days of receipt as required by 40 ILCS 5/4-118(b). While Plaintiffs acknowledge there may be some difference between the amount collected and the amount levied, since taxes are not collected at 100% of the amount levied, the figures above make clear that there was no effort by Harvey to contribute to the Fund in accordance with the specific levied amounts. Moreover, Harvey admitted to using such funds collected on behalf of the Fund for other corporate purposes [citation], which is specifically prohibited under 40 ILCS 5/22-403. None of these facts are in dispute."

We agree.

¶ 201          While Harvey has discretion under the Code in the amount that it distributes to the Pension Fund, Harvey's conduct towards the Pension Fund has exceeded its discretionary authority

under the Code. Based on a review of the amounts levied and contributed to the Pension Fund, this court fails to find any statutory formula, within the Code or otherwise, that Harvey has followed in its contributions. Further, Harvey has, on multiple occasions failed to contribute and failed to levy any money for the Pension Fund. No contributions have been made in 2010, 2011, 2012, or 2013. Additionally, only once since 2003 has Harvey contributed more than 50% of the annual actuarial requirement to the Pension Fund.

¶ 202    As explained by the trial court, "the figures *** make clear that there was *no effort* by Harvey to contribute to the [Pension] Fund in accordance with the specific levied amounts," or any reasonable amounts whatsoever. (Emphasis added.) The fund is using the firefighters' contributions and interest payments to pay its beneficiaries.

¶ 203    Therefore, we affirm the trial court's finding that Harvey has exceeded its discretion under the Code.

¶ 204                    III. Whether Harvey Breached the 1996 Settlement Agreement

¶ 205    The trial court found that Harvey was in breach of the 1996 settlement agreement in two respects: (1) failure to remit property taxes levied specifically for the Pension Fund and (2) failure to remit 12.2% of collected personal property replacement taxes to the Pension Fund.[10] Additionally, the trial court found that the Pension Board had the authority to enforce the agreement, that the agreement was not void, and that the Pension Board did not waive its right to enforce the agreement. For the reasons that follow, we affirm the trial court's findings.

¶ 206                            A. Breach of the Settlement Agreement

¶ 207    Harvey argues that *People ex rel. Toman v. Chicago & Northwestern Ry. Co.* supports its argument that it is not in breach of the settlement agreement because it experienced a shortfall and had to allocate its resources accordingly. 377 Ill. 547 (1941). In *Toman*, the city approved a tax levy for corporate purposes of $106,970. *Toman*, 377 Ill. at 548. To collect the full amount levied for, the city would have needed to tax at a rate significantly higher than what was actually taxed. *Toman*, 377 Ill. at 548-49. For this reason, the city collected only 28% of the amount levied. *Toman*, 377 Ill. at 549. The plaintiff argued that the levy was in violation of the law because it did not specify the purpose for which the taxes were appropriated. *Toman*, 377 Ill. at 549.

¶ 208    The supreme court explained: "The determination, annually, of the amounts necessary to be raised by taxation for corporate purposes is committed to the municipal authorities. Their judgment as to such amounts is final." *Toman*, 377 Ill. at 550. Additionally, if a municipality receives less than the amount levied, the court found that the municipality officers should faithfully discharge their duties to ensure the spending of monies is done in a way best suited for that municipality. *Toman*, 377 Ill. at 551-52.

¶ 209    Harvey compared the situation in *Toman* to its situation. Harvey argues that between 2007 and 2010, "Harvey levied a total general corporate property tax of $31,496,517. That amount included a total of $2,953,070 levied as line items for the Pension Fund. During this same period, Harvey collected only $26,502,965 in property taxes: a $4,993,822 deficit[.]

_____

[10]Harvey's arguments regarding personal property replacement taxes will be covered in the section discussing damages. *Infra* ¶¶ 233-34.

Nevertheless, Harvey still paid the Pension Fund $1,410,202." Harvey argues that, although it did levy money specified for the Pension Fund, the shortfall was allocated to the funds that were to be collected for the Pension Fund. Because this money was uncollected, Harvey argues that it did not breach the settlement agreement. Applying *Toman*, Harvey argues that its city officials exercised their best judgment in allocation of the monies and that these officials should be given a presumption "that they have done so faithfully." *Toman*, 377 Ill. at 552.

¶ 210 However, *Toman* is inapplicable here. *Toman* does allow municipal officials to allocate levied funds that are contributed to a general fund. *Toman*, 377 Ill. at 550. However, *Toman* does not discuss contractual obligations pursuant to a settlement agreement, which is the issue in this case. As the trial court found: "*Toman* does not speak to a specific levy or a specific contractual and statutory obligation to impose a specific levy. Certainly nothing in *Toman* suggests that Harvey was entitled to charge the entire collection deficiency to this specific levy. While there may be no general prohibition on a general levy, the specific levy utilized here, even if it was done as a part of a general levy, *meant that Harvey was required to remit all funds received which were attributable to that specific levy*." (Emphasis added.)

¶ 211 We agree with the reasoning of the trial court. Due to the shortfall in collections on the levies, Harvey is entitled to charge a proportionate amount of the shortfall in 2008, 2009, and 2010 to the Pension Fund's levy; however, under the settlement agreement, Harvey cannot charge the entirety of the shortfall to the Pension Fund. As such, we affirm the lesser included damages of $2,694,600 for unremitted property taxes.

¶ 212 B. Whether the Pension Board Has the Authority
to Enforce the Agreement

¶ 213 Harvey argues that the Pension Board lacks the authority to seek enforcement of the settlement agreement "because the legislature did not grant it the power to bring this lawsuit." To support its argument, Harvey cites sections 16-158.1 and 7-172.1 of the Code, which allow members of the Teachers Retirement System of Illinois [(40 ILCS 5/16-158.1 (West 2012))] and Illinois Municipal Retirement Fund [(40 ILCS 5/7-172.1(a) (West 2012))] the power to compel the Illinois State Comptroller to redirect delinquent payments from funds intended for the municipality to the pension funds instead, unless there are no funds to be remitted to the municipality; then it allows the fund to bring an action against the municipality to recover the delinquent payment. 40 ILCS 5/16-158.1 (West 2012). However, the Code does not provide a similar provision for the Pension Fund.

¶ 214 In response, the Pension Board argues that its authority to bring the claim lies in sections 1-101.2 and 1-115 of the Code. Section 1-115 allows a fiduciary to bring a claim for civil enforcement to "[e]njoin *any act or practice* which violates *any* provision of this Code; or *** [o]btain other appropriate *equitable relief* to redress any such violation or to enforce any such provision." (Emphases added.) 40 ILCS 5/1-115(b)-(c) (West 2014). Section 1-101.2 defines a fiduciary as one that "exercises any discretionary authority or discretionary control respecting management of the pension fund *** or exercises any authority or control respecting management or disposition of its assets; *** renders investment advice ***; or *** has any discretionary authority or discretionary responsibility in the administration of the pension fund." 40 ILCS 5/1-101.2(1)-(3) (West 2014). Additionally, the Pension Board argues that sections 16-158.1 and 7-172.1 of the Code are not comparable because they allow the pension funds to collect delinquent payments from sources other than the municipality. In contrast, the

Pension Board is relying on section 1-115 and case law to bring a lawsuit alleging it is on the verge of default or imminent bankruptcy.

¶ 215    Since the Pension Board is an administrative body that is in a fiduciary relationship with the Pension Fund, we affirm the trial court and find that the Pension Board does have the authority to maintain the suit against Harvey. It is readily apparent that the Pension Board is a fiduciary of the Pension Fund; multiple deponents testified that the Pension Board exercises discretional authority or control over its assets and ensures that it is adequately managed. Therefore, pursuant to section 1-115(a), the Pension Board has the authority to bring an action to "[e]njoin *any* act or practice which violates *any provision of this Code*." (Emphases added.) 40 ILCS 5/1-115(b) (West 2014).

¶ 216    Courts should attempt to give each word of a statute its reasonable meaning without rendering any terms superfluous. *People ex rel. the Department of Labor v. Sackville Construction, Inc.*, 402 Ill. App. 3d 195, 198 (2010). Additionally, courts should "not read into [a] statute exceptions, limitations or conditions that the legislature did not intend." *Sackville Construction*, 402 Ill. App. 3d at 198; *People v. Roake*, 334 Ill. App. 3d 504, 510 (2002). Applying these principles, section 1-115 is clear and allows the Pension Fund to bring an action against a party who is conducting *any act* that violates *any provision* of the Code. 40 ILCS 5/115(b) (West 2014). Therefore, we affirm the trial court's finding.

¶ 217                              C. Whether the Settlement Agreement Was Void

¶ 218    Harvey argues that the Pension Board lacked the authority to enter into the settlement agreement in 1996; therefore, the settlement agreement is *void ab initio* and cannot be enforced. To support its argument, Harvey cites the case of *Elk Grove Township Rural Fire Protection District v. Village of Mount Prospect*, 228 Ill. App. 3d 228 (1992). In this case, Elk Grove entered into a contract with the Village of Mount Prospect to provide firefighting services for the district for 10 years. *Mount Prospect*, 228 Ill App. 3d at 230. In exchange, the district agreed to levy the maximum allowed amount, then turn over the revenues from that tax to Mount Prospect. *Mount Prospect*, 228 Ill. App. 3d at 230. The trial court found that this agreement was void *ab initio* because the municipality lacked the authority to enter into a contract to execute a blanket tax for a long period. *Mount Prospect*, 228 Ill. App. 3d at 232.

¶ 219    Additionally, Harvey cites the case of *Ad-Ex, Inc. v. City of Chicago*, in which Chicago had an ordinance that required signs to be set back 500 feet from expressways. 207 Ill. App. 3d 163, 165 (1990). Chicago entered into a settlement agreement with the plaintiff that waived the 500-foot setback ordinance. *Ad-Ex*, 207 Ill. App. 3d at 166. The court, however, declared the settlement agreement *void ab initio* because it essentially waived the notice and hearing requirements, which Chicago could not legally do. *Ad-Ex*, 207 Ill. App. 3d at 172, 175.

¶ 220    Harvey's reliance on *Mount Prospect* and *Ad-Ex* is misplaced. In both these cases, the agreements the cities entered into were in violation of the law. The cities could not enter into a legally binding contract because to do so would inherently make the contracts *void ab initio*. However, this is not the case before this court. The settlement agreement between Harvey and the Pension Board does not violate any law, nor is it in violation of the Pension Code. As the trial court found: "the Settlement Agreement mirrored Harvey's statutory obligations. As an administrative body and fiduciary of the [Pension] Fund, the [Pension] Board has every right to enforce, enjoin or enter into an agreement on behalf of the [Pension] Fund to compel Harvey's

compliance with the law." For these reasons, we affirm the finding of the trial court.

¶ 221                    D. Whether the Pension Board Waived Its Right to
                                Enforce the Settlement Agreement

¶ 222        Harvey argues that the Pension Board waived its right to enforce the settlement agreement. Waiver " 'is either an express or implied voluntary and intentional relinquishment of a known and existing right.' " *Midway Park Saver v. Sarco Putty Co.*, 2012 IL App (1st) 110849, ¶ 20 (quoting *Whalen v. K mart Corp.*, 166 Ill. App. 3d 339, 343 (1988)). Additionally, a party to a contract can waive enforcement of some provisions "by conduct indicating that strict compliance with the contractual provisions will not be required." *Midway Park Saver*, 2012 IL App (1st) 1100849, ¶ 20; *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970, ¶ 27.

¶ 223        Harvey argues that, based on the standards above, the Pension Board delayed suit, which intentionally triggered a waiver of its right to bring suit under the settlement agreement. Harvey argues:

> "The Pension Board became aware that Harvey allegedly violated the levy provision of the Settlement Agreement at the latest on April 30, 2008. The Pension Board became aware that Harvey allegedly violated the [personal property replacement tax] provision of the Settlement Agreement at the latest on April 30, 2005. The Pension Board did not assert that Harvey breached the Settlement Agreement until December 14, 2012: more than four years after it first learned of Harvey's alleged breach of the levy provision and more than seven years after it first learned of Harvey's alleged breach of the [personal property replacement tax] provision."

¶ 224        In response, the Pension Board asserts that Harvey has the burden to prove that the Pension Board impliedly waived its right in a "clear, unequivocal, and decisive" manner. *Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 105 (1991); *Lavelle v. Dominick's Finer Foods, Inc.*, 227 Ill. App. 3d 764, 771 (1992) ("Waiver is the voluntary, intentional relinquishment of a known right. *** There must be either an intention to waive which, while unexpressed, can be clearly inferred from the circumstances, or where there is no such intention, the conduct of one party must have misled another into acting on a reasonable belief that waiver has occurred."). Additionally, an appellate court should not disturb the finding of the trial court unless that court's finding is contrary to the manifest weight of the evidence. *Sexton v. Smith*, 112 Ill. 2d 187, 194 (1986).

¶ 225        The trial court found:

> "While certainly contract rights can be waived [citations], such waiver occurs where one party to a contract is clearly aware that the contract is being violated, but accepts benefits of the contract and offers not a hint of protest. In this case, Harvey's finances were in complete disarray for much of the period at issue. In the depositions in this case, [Harvey] officials acknowledged that they were unable to determine how much money Harvey actually collected in property taxes on behalf of the [Pension] Fund. Until the parties engaged in discovery in this case, the Board did not know whether [Harvey's] partial contributions to the [Pension] Fund during certain years included the disbursement of [personal property replacement taxes] received. Given the chaotic state of Harvey's finances, the [Pension] Board's failure to take action prior to filing

this lawsuit in 2010 comes nowhere close to an intentional relinquishment of a known right."

¶ 226    We find that the trial court's finding regarding waiver was not against the manifest weight of the evidence; therefore, we will not disturb its finding that Harvey's claim of waiver is without merit.

¶ 227              IV. Whether the Trial Court Correctly Calculated
                              the Damage Award

¶ 228    Harvey argues that the trial court's award of damages is too high because it does not accurately reflect section 4-118 of the Code. In relevant part, this section reads:

> "The city council or the board of trustees of the municipality shall *annually* levy a tax upon all the taxable property of the municipality at the rate on the dollar which will produce an amount which *** *will equal a sum sufficient to meet the annual actuarial requirements* of the pension fund ***. *** For the purposes of this Section, the annual actuarial requirements of the pension fund are equal to (1) the *normal cost of the pension fund*, or 17.5% of the salaries and wages to be paid to the firefighters for the year involved, whichever is greater, plus (2) an annual amount sufficient to bring the total assets of the pension fund up to 90% of the total actuarial liabilities of the pension fund by the end of municipal fiscal year 2040[.]" (Emphases added.) 40 ILCS 5/4-118(a) (West 2014).

Based on this section, Harvey argues that "prior underfunding is taken into account in calculating the 'sum sufficient to meet the annual actuarial requirements of the pension fund,' municipalities must contribute each year only the recommended amount from the most recent actuarial valuation, not the sum of prior actuarial valuations." Therefore, rather than a calculation of damages that combines the missed annual actuarial valuations, Harvey argues that the monetary damages award should be based on only the most recent annual actuarial valuation.

¶ 229    This court agrees with the trial court and the Pension Board. The inclusion of the word "annually" within section 4-118(a) leads this court to believe that these contributions should be made annually. 40 ILCS 5/4-118(a) (West 2014). Additionally, the trial court found "that [the] damage figure reflects Harvey's position that the damage recovery should include the 'normal cost' of the [Pension] Fund for each fiscal year plus the amount that the enrolled actuary calculated *** as the contribution sufficient to bring the total assets of the [Pension Fund] up to 90% of the total actuarial liability of the [Pension Fund] by the end of municipal fiscal year 2040." The trial court continued, "if Harvey had actually funded the full amount in any fiscal year, the actuarial requirement in the following year would be lower because the unfunded liability would be lower." Therefore, the trial court did not exceed its authority under the Code to award monetary damages of $11,561,117, which is the accumulation of damages for 2005 through 2014.

¶ 230    Additionally, Harvey argues that, because an enrolled actuary did not perform the annual actuarial valuation for 2009, 2010 or 2012, Harvey was not required to levy for those years, and the trial court should not have granted damages for those years. In response, the Pension Board argues that many Illinois downstate pension funds rely on the annual actuarial requirement provided by the Department of Insurance and presume that its calculations are

- 41 -

valid. Additionally, the Pension Board argues that Harvey was never required to accept the calculations of the Department of Insurance and could have hired an actuary to perform the calculations during these years. Nonetheless, the failure to do so should "not shield it from liability particularly where the Pension Board did not know, and could not have known, that the [Department of Insurance] was either (1) not using an enrolled actuary or (2) was not going to prepare an actuarial valuation for 2012. Further, the Pension Board argues that Harvey's expert, Sandor Goldstein, prepared an updated annual actuarial valuation for 2009, 2010 and 2012.

¶ 231    The Code states that a municipality shall annually levy a tax that will meet the annual actuarial requirements of a pension fund "as annually updated and determined by an enrolled actuary employed by the Illinois Department of Insurance or by an enrolled actuary employed by the pension fund or the municipality." 40 ILCS 5/4-118(a) (West 2014). Whether Scott Brandt is or is not an enrolled actuary does not matter because of his employment by the Department of Insurance, who presumably, because it created the calculations currently used to determine the annual actuary valuations, understands how to calculate the annual actuarial valuations. As such, pension funds and municipalities across Illinois rely on and use the Department of Insurance's calculations every year. Additionally, many of the deponents in this case, including Jon Willhite and Sandor Goldstein, testified that these calculations were acceptable based on their knowledge and experience. Therefore, the trial court did not exceed its authority in including the years 2009 and 2010 in its damage calculation.

¶ 232    As for 2012, Harvey is correct that the Illinois Department of Insurance did not issue an annual actuarial valuation for this year. However, the annual actuarial valuation for 2012 was determined both by Sandor Goldstein, Harvey's expert, and Jon Willhite. Goldstein conducted the calculation retroactively, determining it was $864,407 for 2012. Willhite testified that, traditionally, actuaries would take the previous years' calculations and add 5 to 15%, then use that as the annual actuarial requirement. However, Willhite testified that he used 2011's calculations as 2012 calculations. Further, he testified that this is common practice within the field.

¶ 233    Both Goldstein and Willhite are enrolled actuaries, and both determined an annual actuarial requirement for 2012. Therefore, the trial court did not exceed its authority in relying on the calculations of Willhite to determine damages for 2012. For these reasons, the trial court's damage calculation of $2,694,600, as a lesser included amount of the $11,561,117 in damages, is affirmed.

¶ 234    Lastly, Harvey argues that the trial court incorrectly calculated the unremitted personal property replacement taxes. It is undisputed that Harvey collected $7,067,022 in personal property replacement taxes between 2005 and 2014. It is also undisputed that Harvey should have remitted 12.2% of these funds to the Pension Fund, which would equal $858,516.68. However, Harvey argues that the trial court "misinterpreted Comptroller Williams's affidavit as stating that Harvey has paid, in total, only $48,624 in [personal property replacement taxes] from 2005 to 2013." Therefore, Harvey asks this court to vacate the damage award because it should be $537,727.44.

¶ 235    However, upon review of the record, this court finds that Harvey waived this issue on appeal. The "primary purpose of the waiver rule is to ensure that the trial court has the opportunity to correct any errors before they are raised on appeal." *First National Bank of La Grange v. Lowrey*, 375 Ill. App. 3d 181, 201 (2007); *Moller v. Lipov*, 368 Ill. App. 3d 333,

342 (2006) ("A primary purpose of the waiver rule is to ensure that the trial court has the opportunity to correct the error. [Citation.] A trial court cannot correct the error and prevent prejudice when the objection is not made as the error occurs."). As such, the trial court was not provided an opportunity to correct the personal property replacement taxes if it committed an error in its decision. However, Harvey had ample opportunity to raise the issue. The trial court on June 25, 2015, found that "[t]here is no dispute that Harvey owes the [Pension] Fund $809,892 in unremitted [personal property taxes]." Nonetheless, the trial court asked the parties to submit an updated damage calculation before it entered a final damages order. In its proposed damages argument, Harvey did not argue that the trial court's determination of $809,892 in unremitted personal property replacement taxes was incorrect. Additionally, Harvey never presented any evidence that the personal property replacement tax calculation was incorrect. Therefore, Harvey has waived this argument, and we affirm the calculation of the trial court.

¶ 236                    V. Whether the Trial Court Correctly Ruled on
                              Harvey's Affirmative Defenses

¶ 237                          A. Separation of Powers

¶ 238     The trial court ruled[11] that the Pension Board's claims were not barred by the separation of powers clause of the Illinois Constitution. Ill. Const. 1970, art. II, § 1. The separation of powers clause states: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. The trial court determined that, although the judiciary is cautious when choosing to venture into a legislative branch's powers, such as taxation, the judiciary will step in to enforce the law when a municipality abuses its discretion under the law.

¶ 239     Harvey's reliance on *Diamond v. Board of Fire & Police Commissioners*, as the appellate court's interpretation of the separation of powers doctrine, is misplaced. 115 Ill. App. 3d 437 (1983). The quotation provided by Harvey is about whether the district court had the authority to compel Elk Grove to establish a special board on remand to hear the case of a terminated officer. *Diamond*, 115 Ill. App. 3d at 445. The appellate court found that the trial court could not force Elk Grove to establish this special board because that would require the adoption of a city ordinance. *Diamond*, 115 Ill. App. 3d at 445. The appellate court determined that a circuit court does not have the authority "to dictate that such an ordinance be adopted." *Diamond*, 115 Ill. App. 3d at 445. Therefore, the appellate court reversed the trial court's ruling. *Diamond*, 115 Ill. App. 3d at 445.

¶ 240     The case of *Mathews v. City of Chicago*, which is cited by both parties, is more applicable to the current case. 342 Ill. 120 (1930). In *Mathews*, an Illinois taxpayer challenged three laws passed by the General Assembly that allowed the creation and maintenance of a "working cash fund" in cities, counties, and school districts that were over a certain population. *Mathews*, 342 Ill. at 123. These cash funds authorized the city, county, or school district to issue bonds without a referendum to fund the working cash funds. *Mathews*, 342 Ill. at 123. Mathews

---

[11]The trial court partially granted Harvey's affirmative defense of separation of powers. The trial court denied the Pension Board's motion for summary judgment for a writ of *mandamus* based on the separation of powers doctrine. However, because neither party appealed the trial court's ruling regarding the writ of *mandamus*, we will not be discussing it here.

argued that these three acts to create the funds and the issuance of bonds were unconstitutional because "they attempt to authorize taxation which is not needful and is for other than public or corporate purpose, in violation of [the Illinois Constitution]." *Mathews*, 342 Ill. at 127.

¶ 241　　In deciding the case, the Illinois Supreme Court found: "The amount of taxes and the rate of taxation are exclusively for the General Assembly and may be increased or decreased at its pleasure. The exercise of its discretion cannot be controlled by the court. *** The amount [to] be levied is left to the sound discretion and business judgment of the city council, the county board or the board of education." *Mathews*, 342 Ill. at 141. The supreme court continued: "the courts have the authority to interfere and prevent a clear abuse by such authorities of their discretionary powers." *Mathews*, 342 Ill. at 141.

¶ 242　　Therefore, although Harvey is correct in stating that it has the authority to set its levies, it cannot abuse its discretionary powers pursuant to the Code. See *Barrett v. Henry*, 2013 IL App (2d) 120829, ¶¶ 12-13. The Code explicitly states: "the municipality shall annually levy a tax upon all the taxable property of the municipality at the rate on the dollar which will produce an amount which *** will equal a sum sufficient to meet the annual actuarial requirements of the pension fund." 40 ILCS 5/4-118(a) (West 2014). Although Harvey is allowed discretion by the Code, the General Assembly requires Harvey to enact a levy for the Pension Fund, which Harvey has failed to do. Because Harvey has abused its discretion, this court affirms the trial court's ruling that the separation of powers doctrine does not bar the Pension Board's claim.

¶ 243　　　　　　　　　　　　　　　B. *Laches*

¶ 244　　When reviewing a trial court's determination as to whether the affirmative defense of *laches* applies to a case, an appellate court will reverse the decision only if the trial court's decision was " 'so clearly wrong as to constitute an abuse of discretion.' " *Lozman v. Putnam*, 379 Ill. App. 3d 807, 822 (2008) (quoting *Hannigan v. Hoffmeister*, 240 Ill. App. 3d 1065, 1074 (1992)). An abuse of discretion standard is met when the trial court's decision was " 'palpably erroneous, contrary to the manifest weight of the evidence, or manifestly unjust.' " *Lozman*, 379 Ill. App. 3d at 822 (quoting *O'Brien v. Meyer*, 281 Ill. App. 3d 832, 835 (1996)). A trial court's decision is considered an abuse of discretion only when it is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1105 (2009).

¶ 245　　To prevail on the affirmative defense of *laches*, defendants must prove (1) that there was a lack of due diligence by plaintiffs in bringing suit and (2) that plaintiffs' delay resulted in prejudice to defendant. *Lozman*, 379 Ill. App. 3d at 822; see *People v. McClure*, 218 Ill. 2d 375, 389 (2006). Harvey claims that it has fulfilled these two requirements because the five-year delay in bringing suit was due to a lack of diligence and this delay prejudiced Harvey. Harvey has to prove that it was unknowingly accruing liability because the Pension Board slept on its rights; however, as the trial court noted and this court can determine based on the record, Harvey was knowingly accruing liability and this fact is clear from review of the Pension Fund's annual actuarial reports. Further, Harvey contributed well below the annual actuarial requirement to the Pension Fund in 2009 and 2010 before the suit was filed and then continued to contribute nothing to the Pension Fund for the three years after the filing of the suit. There is nothing to suggest that Harvey was "unknowingly" accruing liability over the period alleged by Harvey.

¶ 246    This court finds ample evidence to support the trial court's finding that *laches* does not apply; therefore, we affirm the ruling of the trial court, which found Harvey did not fulfill the requirements to establish the affirmative defense of *laches*.

¶ 247                                    VI. *Mandamus*

¶ 248    In the Pension Board's cross-appeal, they seek a reversal of the trial court's denial of its request for a writ of *mandamus* in count II of its complaint. A writ of *mandamus* is issued to force a defendant to perform a ministerial act that is not discretionary in character. *Evanston*, 281 Ill. App. 3d at 1052. In order for the Pension Board to be entitled to relief, it must show (1) a clear right to the relief requested, (2) a clear duty of Harvey to act, and (3) clear authority for Harvey to comply with the writ. *Clarke v. Community Unit School District 303*, 2012 IL App (2d) 110705, ¶ 24.

¶ 249    The Pension Board argues that section 4-118(a) of the Pension Code clearly mandates that Harvey make annual contributions to the Pension Fund according to an annual actuarial evaluation. However, section 4-118(a) does not remove Harvey's discretion in making annual contributions. The statute allows Harvey to base its levy on the AAR as calculated by any of three different actuaries. In addition, Harvey can make a calculation as to the amount that it must levy to "produce" an amount necessary to meet Harvey's required contribution to the Pension Fund. 40 ILCS 5/4-118(a) (West 2014). Taxes levied by Harvey are not collected at the rate of 100% and, as a result, there is clearly some discretion required in order to make this projection. As long as Harvey, within its discretion, is levying an amount that would be enough to produce the AAR-mandated contribution, Harvey would be meeting its obligations under the Code. Harvey "is vested with the authority to take the final action: adopting an ordinance levying the tax." *Evanston*, 281 Ill. App. 3d at 1053. Although Harvey must meet the statutory funding requirements, the enactment of the pension tax levy is not a mere ministerial act subject to a writ of *mandamus*. We affirm the trial court on its denial of the issuance of a writ of *mandamus*.

¶ 250                                  VII. Judicial Notice

¶ 251    "Upon the review by any court of appellate jurisdiction of a judgment or order of a circuit court the court of appellate jurisdiction shall take judicial notice of all matters of which the circuit court was required to take judicial notice, including all rules of practice adopted by the circuit court." 735 ILCS 5/8-1002 (West 2014).

¶ 252    At oral arguments, this court invited the parties to request judicial notice of agreed facts that have occurred after the conclusion of this case in the circuit court of Cook County.

¶ 253    This court takes judicial notice of the following facts that are undisputed by the parties. However, the taking of judicial notice of these facts does not in any way affect this court's decision on this appeal:

> (1) That between July 11, 2014, and December 31, 2016, the City of Harvey contributed $2,177,319.31 to the Firefighter's Pension Fund from tax revenue collected from Harvey's taxpayers during that period of time.

> (2) That Harvey levied $800,000 for the Pension Fund for fiscal year 2015 (collected in 2016). However, the statutory minimum annual actuarial requirement for the Pension Fund for fiscal year 2015 was $1,950,025. Harvey contributed $750,764

and the Pension Fund had net assets of $10,954,619 for fiscal year ended April 30, 2015. In accordance with the trial court's injunction entered in September 2015, Harvey levied the statutorily required annual actuarial requirement for the Pension Fund of $2,083,797 for fiscal year 2016 (collected in 2017). However, Harvey did not levy the required amount on or before the last Tuesday in December 2015 as required by the injunction but approved the levy four months late. The Cook County clerk agreed to accept the late levy. The Pension Fund received $398,566 in city contributions and had net assets of $9,290,602 for the fiscal year ended April 30, 2016. Harvey did not levy on or before the last Tuesday in December 2016 the annual actuarial requirement for the Pension Fund for fiscal year 2017.

(3) That, as of May 3, 2017, the Pension Fund currently has $9,245,541.93 in assets.

¶ 254    The monies that Harvey paid into the Pension Plan were a result of the trial court's injunction. Harvey's compliance was not timely for the fiscal year of 2016, and Harvey did not levy on or before the last Tuesday in December 2016 the annual actuarial requirement for the Pension Fund for the fiscal year 2017. As of May 3, 2017, it is noted that the Pension Fund's assets have been depleted to $9,245,541.93.

¶ 255                                    CONCLUSION

¶ 256    The issues on appeal include (1) whether the trial court correctly determined that the Pension Fund is not on the verge of default or imminent bankruptcy, (2) whether the trial court correctly determined Harvey violated the Pension Fund's statutory rights, (3) whether the trial court correctly determined that Harvey breached the 1996 settlement agreement, (4) whether the trial court correctly calculated the damages, and (5) whether the trial court correctly rejected Harvey's affirmative defenses of the separation of powers and *laches*.

¶ 257    For the reasons discussed above, we affirm in part and reverse in part the trial court's findings. We affirm the trial court's ruling on issues (2), (3), (4), and (5) in finding that Harvey violated the Pension Fund's statutory rights; that Harvey did violate the 1996 settlement agreement; that the trial court's calculation of damages is correct; and that Harvey's affirmative defenses were correctly rejected. However, as to issue (1), we reverse the trial court's finding and find that the Pension Fund is on the verge of default due to Harvey's blatant disregard of the Pension Fund for many years and the severe lack of any financial responsibility shown by Harvey, which has substantially impaired the Pension Fund to the point that the firefighters' pension rights will be diminished in the near future.

¶ 258    Accordingly, we affirm the trial court's damages award, injunctive order, and denial of writ of *mandamus*.

¶ 259    Affirmed in part, reversed in part.

¶ 260    JUSTICE LAMPKIN, specially concurring:

¶ 261    I agree with the majority's conclusion that the pension fund benefits are already impaired and soon will be diminished. I write separately to clarify why I believe the Pension Fund is on the verge of default or imminent bankruptcy and the relevant factors considered in that analysis.

¶ 262    The pension protection clause makes participation in a public pension plan an enforceable contractual relationship and also demands that the "benefits" of that relationship "shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5; see also *Sklodowski*, 182 Ill. 2d at 229. Although the clause does not create a contractual basis for participants to expect a particular level of funding, it does create a contractual right for pension participants to receive the money due to them at the time of their retirement. *Sklodowski*, 182 Ill. 2d at 230 (the General Assembly did not intend "to create any 'vested' contractual relationship in the Pension Code that would allow participants to enforce funding provisions"). Furthermore, pension beneficiaries do not have to "wait until benefits are actually diminished to bring suit under the clause" because if benefits are impaired, *i.e.*, if a pension fund is on the verge of default or imminent bankruptcy, the beneficiaries could take a group action to show that their rights should be preserved. *Sklodowski*, 182 Ill. 2d at 232 (citing *McNamee*, 173 Ill. 2d at 446-47). There is a distinction between *diminishing* a beneficiary's right to receive pension benefits and *impairing* that right. Benefit rights are diminished if they are abolished, lessened, or if the terms are changed after the participant has vested. See 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2926, 2931-32 (statements of Delegate Kinney). Benefit rights are impaired when a pension fund is on the verge of default or imminent bankruptcy and the rights need to be preserved. See 4 Record of Proceedings 2926.

¶ 263    Here, Harvey is currently paying the Pension Fund beneficiaries their pensions, which have not been reduced in anyway, so the benefit rights have not been diminished. However, the evidence of several relevant factors clearly established that the benefit rights have been impaired such that the fund is on the verge of default or imminent bankruptcy. These factors include, first, the financial status of the Pension Fund primarily from 2005 through 2013, except that the data about the fund's 2011 financial status should be excluded due to conflicting data. According to Jon Willhite, the Pension Fund's financial consultant since the 1980s, the actuarial recommended contributions for 2005 to 2013 were approximately $11.6 million. Harvey, however, contributed only $1.4 million to the Pension Fund during that time period while that fund paid almost $13.6 million to beneficiaries. Accordingly, Harvey contributed only about 12% of the actuarial recommendation and the Pension Fund paid, on average, nine times more per year to its beneficiaries than Harvey had contributed to the fund.

¶ 264    Second, the fast rate at which the Pension Fund is being depleted supports the finding that it is on the verge of default or imminent bankruptcy. In his deposition, Sandor Goldstein, Harvey's retained actuary, stated that Harvey "deprived the Pension Fund of $8 million in *actual* contributions and another $2 million in *actual* investment gains on those contributions" because Harvey failed to make proper contributions to the Pension Fund from 2005 to 2013. Goldstein demonstrated Harvey's depletion of the net assets of the Pension Fund based on the following net asset balances over time: $17,530,040 in April 2008; $12,848,718 in May 2012; $11,501,101 in December 2013; $11,180,962 in May 2014; $10,936,532 in March 2015; and $10,119,246 in October 2015. By April 30, 2015, the Pension Fund was only 25% funded. The Pension Fund's $17 million in assets in 2009 was depleted by 2013 to approximately $11.1 million, which represented a more than one-third depletion of the fund in merely four years. Todd Schroeder, the Pension Fund's retained actuary, opined in his deposition that the Pension Fund should have had approximately $34 million in assets as of 2014 instead of its actual balance of $11,180,962 in assets, which left the fund deficient at the end of 2013 by approximately $23 million.

¶ 265       Third, the revenue available to Harvey to support the city's financial needs supports the finding that the Pension Fund is on the verge of default or imminent bankruptcy. Harvey has only 25,000 residents, and the evidence demonstrated that Harvey was not able to collect on its tax levies to support the city's general corporate obligations over the time period at issue here. Additionally, as of May 2015, Harvey had 47 active firefighters and 67 retirees or beneficiaries. In 2014, the Pension Fund paid approximately $157,000 a month to the beneficiaries while contributions from the active firefighters were approximately only $25,000 a month. The contributions of the active firefighters were being used to pay the current beneficiaries instead of being invested for the active firefighters' future pension benefits. Also the evidence established that for several years the Pension Fund had to liquidate invested assets every month in order to pay the monthly benefits, and the invested assets have been declining at an alarming rate each year. Willhite opined that the Pension Fund is unable to invest its way out of financial collapse based on its current allocation and return projections relative to cash outflows. Specifically, Willhite stated that, based on the Pension Fund's current condition and the rate that money has been going out of the fund, it will "reach a time when there will be no money left in the [Pension Fund] as we know it today." Willhite opined that the Pension Fund will be insolvent in seven to nine years. Consistent with Willhite's opinion, actuary Schroeder accurately predicted that the Pension Fund would pay out $2 million in fiscal year 2014. He also predicted that the payouts would increase in 2017 to $2.7 million due to statutory cost-of-living increases and additional retirements. Further, he predicted that, within five years from 2015, the Pension Fund will have to pay $11.8 million in benefits and administrative costs—which amount is $1.7 million greater than the Pension Fund's October 2015 net assets.

¶ 266       Fourth, from 2007 through 2011, Harvey failed to contribute to the Pension Fund any of the statutorily required amount of 12% of the personal property replacement taxes disbursed by the State of Illinois.

¶ 267       Based on the foregoing evidence of Harvey's failure over several years to contribute to the Pension Fund any more than an average of about 12% of the actuarial recommendations, the fast depletion rate of the fund, and the lack of revenue sources available to Harvey, the Pension Board has shown that the Pension Fund is on the verge of default or imminent bankruptcy such that the benefits are in immediate danger of being diminished. This is not merely a matter of an underfunded pension plan. The severe fund deficiency and alarming rate of asset depletion, and Harvey's demonstrated inability to collect on its tax levies to support its obligations establish that the Pension Fund's ability to pay the beneficiaries will be extinguished in the near future.